CHESTER J. BRODERICK & others vs. POLICE COMMISSIONER
OF BOSTON.

Suffolk.   February 6, 1975. — June 4, 1975.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, & HENNESSEY, JJ.

*Police.   Constitutional Law*, Public employment, Self-incrimination.
   *Public Employment.   Privacy.   Words*, "Relating to."

Alleged outrageous, possibly illegal, conduct at an inn and during a
   parade on the part of some of the approximately ninety off-duty
   police officers of Boston, who journeyed to another city to represent
   the Boston police department at a weekend celebration and who
   marched in uniform under the department's flag, was a proper
   subject of inquiry by the Boston police commissioner [41-43]; and a
   questionnaire sent to about one hundred forty off-duty Boston
   police officers directly and factually relating to events occurring at
   the inn and the parade was narrowly limited and reasonably
   related to determining the "fitness" of recipients of the question-
   naire as police officers, and all recipients must provide written
   answers [35-44].

BILL IN EQUITY filed in the Superior Court on May 29,
1974.

The suit was heard by *Smith*, J.

After review was sought in the Appeals Court, the
Supreme Judicial Court, on its own initiative, ordered
direct appellate review.

*Frank J. McGee, Jr.* (*Vincent A. Harrington, Jr.*, with
him) for the plaintiffs.

*Michael De Marco* (*Lawrence J. Ball* with him) for the
Police Commissioner of Boston.

HENNESSEY, J.   This is an appeal by the plaintiffs, who
are police officers in the city of Boston, from a declara-
tory judgment entered by a Superior Court judge
declaring, in essence, that the officers must provide
written answers to a number of written questions ad-

dressed to the officers by the defendant, who is the police commissioner of the city of Boston (commissioner). After the appeal was entered in the Appeals Court, the case was transferred to this court on our own motion. We affirm.

On Friday, May 10, 1974, approximately ninety off-duty Boston police officers journeyed to Newport, Rhode Island, to participate in what was planned as a Law Day celebration. The celebration was to take place over the weekend, the main event scheduled being a parade on Saturday wherein the officers were to march as a contingent representing the city of Boston, along with units from several other States and cities. Arrangements had been made for the celebration by the members of the Newport police association. It was planned that the Boston police officers would spend Friday evening at the Ramada Inn in Portsmouth. The police officers arrived either by private cars or by a bus chartered by the Boston Police Patrolmen's Association, Incorporated.

Shortly after the weekend, the commissioner[1] received complaints concerning the officers' conduct at the Ramada Inn and during the parade. He assigned a deputy superintendent to investigate. During the course of his investigation, the deputy superintendent received fifteen or sixteen complaints from employees of the inn. In addition, the manager of the inn submitted an affidavit in complaint. The affidavit alleged in general: that a customer at the inn, while playing pool in the bar area, had had his pool cue snatched away in the course

---

[1] Pursuant to St. 1962, c. 322, § 11, the police commissioner is charged with administration of the police department. "The police commissioner shall have cognizance and control of the government, administration, disposition and discipline of the department, and of the police force of the department and shall make all needful rules and regulations for the efficiency of said police . . . . Officers and members of said police shall, *whether on or off duty,* be subject to the rules and regulations made under this section" (emphasis supplied).

of which he had been punched in the chest by a person subsequently identified by the manager as a Boston police officer; that the manager had observed "15 or 20 Police Officers at one point diving and playing in the pool in the nude, screaming and yelling like a bunch of wild kids"; that the manager had seen three nude males walking about in the vicinity of the pool area and the hotel lobby; that during the night a group of men roamed about the hallways using foul and opprobrious language; that at one point during the night the manager was awakened by what he thought were gun shots which were in fact some form of fireworks; that sometime during the night the hotel liquor cabinet was broken into and five quarts of liquor were stolen; and that some guests had left the inn without paying for their breakfast. The Portsmouth police were summoned twice in the course of the evening, as well as the State police, who were called once. The deputy superintendent also received complaints regarding the conduct of the police officers during the parade, particularly with respect to those officers operating police motorcycles.

As a result of these complaints, the deputy superintendent sought to ascertain how many Boston police officers were at the Ramada Inn on the days in question; whether all of the police officers present in Rhode Island were scheduled off-duty; and he sought further to investigate the allegations of misconduct to determine whether any disciplinary proceedings were called for. After the preliminary investigation, including interviews with witnesses and the showing of photographs, was concluded, the deputy superintendent prepared a questionnaire which required certain police officers to file a narrative report of the events occurring in Rhode Island, the report to be based on the fifteen questions set forth. The questions inquired generally as to whether the officer had been registered or present at the inn; whether the officer had witnessed any events thereat; and further asked specific questions relating to the activities at the parade.

The questionnaire was submitted to the commanding officers of the various precincts with a directive that it be distributed to those police officers who were listed on the records of the Boston police department as being absent from the duty roster on the days in question. The order to submit a report based on the questions stated, "It is brought to the attention of all officers concerned that, in accordance with 'Silverio vs. Municipal Court of Boston' 355 Mass. 623 [1969] and 'Gardner vs. Broderick' 392 U. S. 273 [1968], when a member of the department is complained against and is directed by his commanding officer to submit his report relative to such complaint, he is required to comply."

On receipt of the questionnaires, the plaintiffs brought suit for declaratory relief (G. L. c. 214), to determine whether they were under any legal duty to respond to the questionnaire. In addition to a declaration of rights the relief sought was an injunction prohibiting the commissioner from ordering the plaintiffs to provide the information requested in the questionnaire.[2]

The legal grounds urged by the plaintiffs are that the questionnaire inquired as to "off-duty noncriminal conduct" and is therefore violative of rights guaranteed by our State and Federal Constitutions, and further that the questionnaire was in violation of St. 1973, c. 941, inserting G. L. c. 214, § 1B, which guarantees a right of privacy.

A preliminary injunction was issued by order of a Superior Court judge on May 29, 1974. Trial was held in the Superior Court on June 10, 1974. The judge found that the order to submit the report "is reasonable

---

[2] The plaintiff Broderick is chairman of the Boston Police Patrolmen's Association; the plaintiff Bilodeau is vice-chairman of the association, and the plaintiff Whelan is the secretary of the association. All three men are Boston police patrolmen. It has been stipulated by the plaintiffs and the defendant that the decision in this case would bind all other patrolmen who are members of the association and who have received orders to make reports.

and within the respondent's authority" and further found "that the order of the respondent as to the off-duty conduct of the petitioners and other police officers bears a reasonable relationship to the petitioners' and the other police officers' fitness or capacity to properly function as an on-duty police officer." The trial judge ordered the preliminary injunction dissolved.

The often quoted epigram by Mr. Justice Holmes written in an opinion of this court, *McAuliffe* v. *Mayor & Aldermen of New Bedford,* 155 Mass. 216, 220 (1892), to the effect that a police officer "may have a constitutional right to talk politics, but he has no constitutional right to be a policeman," is, as far as it goes, a correct statement of the law. *Boston Police Patrolmen's Assn. Inc.* v. *Boston,* 367 Mass. 368 (1975). *O'Hara* v. *Commissioner of Pub. Safety,* 367 Mass. 376 (1975). *United States Civil Serv. Commn.* v. *National Assn. of Letter Carriers, AFL-CIO,* 413 U. S. 548 (1973). *Broadrick* v. *Oklahoma,* 413 U. S. 601 (1973). However, that statement is tempered by the principle that public employment may not "be conditioned upon the surrender of constitutional rights which could not be abridged by direct government action." *Keyishian* v. *Regents of the Univ. of the State of N. Y.* 385 U. S. 589, 605 (1967).

The issue presented here is whether the questionnaire as drawn infringed either the plaintiffs' constitutional or statutory rights. While resolution of this issue at first glance appears to involve the Fifth Amendment to the United States Constitution's privilege against self-incrimination, closer analysis reveals that this constitutional right is only tangentially involved, the more pertinent inquiry here being whether the substance of the inquiry bears a rational connection either specifically to the officer's direct performance of official acts, or generally to the officer's fitness and ability to serve in governmental service.

That requiring the plaintiffs to answer the inquiries directed to the activities in Rhode Island does not infringe their Fifth Amendment rights is made clear by the deci-

sion of the United States Supreme Court in *Gardner* v. *Broderick,* 392 U. S. 273 (1968), a case almost directly in point to the issue we consider here.  In the *Gardner* case the court stated that "[i]f appellant, a policeman, had refused to answer questions specifically, directly, and narrowly relating to the performance of his official duties, without being required to waive his immunity with respect to the use of his answers or the fruits thereof in a criminal prosecution of himself, . . . the privilege against self-incrimination would not have been a bar to his dismissal."[3]    *Id.*  at  278.    Accord, *Silverio* v. *Municipal Court of the City of Boston,* 355 Mass. 623 (1969).   See generally, *Beilan* v. *Board of Educ., Pub. Sch. Dist. of Philadelphia,* 357 U. S. 399 (1958); *Lerner* v. *Casey,* 357 U. S. 468 (1958); *Faxon* v. *School Comm. of Boston,* 331 Mass. 531 (1954).   But see *Slochower v. Board of Higher Educ. of New York City,* 350 U. S. 551 (1956); *Opinion of the Justices,* 332 Mass. 763 (1955). As we stated in the *Silverio* case, *supra,* at 629:  "[A]n employee knows that if he fails to divulge information pertinent to the issue of his use or abuse of his public trust he may lose his job.   The fact of employment poses the continuing choice of whether to divulge such information.    The Constitution of the United States, however, as we understand its construction, does not require that a public employer continue to employ in a position of public trust an employee who declines or renders himself unable to perform the duties of his position on the ground of the constitutional protection against self-incrimination."

---

[3] Having determined that a refusal to answer relevant inquiries might be grounds for dismissal from public service, the question arose whether evidence obtained under threat of dismissal could constitutionally be used in subsequent criminal proceedings.   The case of *Garrity* v. *New Jersey,* 385 U. S. 493 (1967), held that it could not. The questionnaire in this case strictly adhered to the requirements of the *Garrity* case by providing that "anything the officer relates concerning the charge against him cannot be used in evidence in a criminal court."

The plaintiffs rely heavily on the above quoted language in the *Gardner* case. They argue that the questions contested herein sought to inquire as to off-duty conduct of the officers while in Rhode Island, and that therefore the questions do not specifically, directly, and narrowly relate to the performance of official duties and, as the plaintiffs characterize the situation, "It is as though, for instance, the petitioners were on vacation." Alternatively, the plaintiffs argue that, even if the commissioner has a right to inquire into off-duty conduct, that right is contingent on the commissioner's (1) addressing his inquiry exclusively to officers shown to be involved, (2) affirmatively demonstrating, before any response is required, that the conduct to be investigated directly affects the officer's public employment. We disagree.

Contrary to the plaintiffs' contention, we do not read *Gardner v. Broderick, supra,* as limiting the scope of inquiry to matters occurring while on duty. The far more logical reading of the language in the *Gardner* case is that the inquiry must not be general and exploratory in nature but must be limited to the specific infraction under investigation. Thus the State without more could not generally inquire whether a State employee did or did not claim his privilege against self-incrimination in an independent proceeding and therefrom infer guilt. *Confederation of Police v. Conlisk,* 489 F. 2d 891 (7th Cir. 1973), cert. den. sub nom. *Rochford v. Confederation of Police,* 416 U. S. 956 (1974). Nor should the State phrase general and vague questions in a broad dragnet approach.

The crucial phrase in the *Gardner* quotation is "*relating to* the performance of his official duties" (emphasis supplied). "Relating to" implies more than matters taking place on duty; we think it extends to matters *of and concerning* an individual's fitness for public service. We decline to hold that the commissioner must close his eyes to what might constitute outrageous,

even illegal, conduct on the part of police officers under his command on the principle that the conduct took place when the officer was off duty.

However, we need not decide this case exclusively on the on-duty/off-duty dichotomy because we perceive the conduct at issue here to have been undertaken under sufficient banners of officialdom to take it outside the pale of purely private conduct.

It is true that the plaintiffs were off duty, carried no weapons, wore their uniforms only in the parade (although they had the uniforms on when they left the inn for the parade), and were not compensated for their time spent in Rhode Island. On the other hand, the police officers were invited to Rhode Island for the purpose of representing the Boston police department; they were to march in the parade in the uniform of the Boston police. Arrangements for a bus to Rhode Island and payment therefor were made by the Boston Police Patrolmen's Association. Arrangements for the police officers while in Rhode Island were made by the Newport police association, and the latter association paid for the accommodations at the inn. Apparently the reservations at the inn were made for the police officers as a group. On their arrival the officers did not register by individual name; rather one officer signed for the two or three officers occupying each room. Thus the rooms at the inn were in a sense registered to the officers as a group of Boston police officers and not as individual persons. The officers had requested that they be allowed to use four Boston police department motorcycles in the parade; the plaintiff Broderick spoke with the commissioner who granted permission to use the motorcycles subject to the posting of a bond. Further, and of some importance, the police officers while marching in the parade not only wore the uniform of the Boston police department, but displayed and marched under the Boston police department flag, the city of Boston flag, the Commonwealth of

Massachusetts flag, and the banner of the Boston Police Patrolmen's Association.[4]

This conduct is something more than purely private activity. Because of our conclusion that this activity was undertaken under a cloak of officialdom, we are not drawn into questions relating to purely private conduct. However, we agree with the trial judge that, even if this investigation could be described as concerning conduct more private than official, the inquiry would be permissible and the officers would be required to file the reports directed in the questionnaire.

It is clear that with respect to private conduct the breadth of inquiry that may be undertaken by the State as an employer would perforce seem less wide than that inquiry permitted with respect to official conduct. The problem, of course, is defining the standards to establish the limits of any inquiry into private affairs. However, no one would contend that the commissioner should not be allowed, for example, to ask questions relating to private conduct if affirmative answers to those questions would unqualifiedly be grounds for dismissal from the police force, or warrant other disciplinary action. In this regard, we have on occasion sustained the dismissal of a police officer for conduct which did not occur in the performance of his official duties, stating that " [t]he circumstance that this testimony related to a time when the officer was not in uniform and was not on duty is not decisive. His conduct while off duty and in civilian clothes might be of such nature as to show him unfit to continue to act as a police officer." *Mayor of Medford* v. *First Dist. Court of E. Middlesex,* 249 Mass. 465, 470

---

[4]Surely the spectators watching the parade and the patrons at the inn regarded the officers as comprising a contingent of the Boston police department. The perception of the public of the police officers is not without relevance since "police morale and discipline and the public's attitude toward the police" are in a sense intricately intertwined. *Selectmen of Framingham* v. *Civil Serv. Commn.* 366 Mass. 547, 555 (1974).

(1924) (dismissal for improper relations with a woman not the officer's wife). *Mayor of Newton* v. *Civil Serv. Comm.* 333 Mass. 340, 343 (1955) (dismissal of police officer on charge of and arrest and conviction for intoxication). Cf. *Attorney Gen.* v. *Tufts,* 239 Mass. 458 (1921) (wrongs which render a person unfit to hold the office of district attorney need not be committed in the immediate performance of duty, but may arise wholly outside of official duties).

Even if we were to reach a different result in any one of these cases if presented with similar circumstances today, the fact remains, as these cases indicate, that official conduct is not the only area which may be a subject of inquiry. This is particularly so in the sphere of law enforcement where, as noted by the Supreme Court in the *Gardner* case, a police officer "is directly, immediately, and entirely responsible to the city or State which is his employer. . . . He is a trustee of the public interest, bearing the burden of great and total responsibility to his public employer." 392 U. S. at 277-278 (1968). In another context see *Wormstead* v. *Town Manager of Saugus,* 366 Mass. 659 (1975).

We do not mean to imply that all aspects of a police officer's or other State employee's private life may be subject to scrutiny by his superiors. Nor may a police officer be required, on penalty of dismissal, to answer every inquiry directed to his conduct while off duty. It may be that the breadth of the inquiry into private conduct is limited to matters the answer to which may be sufficient to trigger some sort of disciplinary proceeding. At that point private conduct may be deemed to have spilled over into the realm of official concern. See generally, Gunther and Dowling, Cases and Materials on Constitutional Law, 1300-1315 (8th ed. 1970). In any event an inquiry into private affairs must bear a sufficiently rational connection to the officer's position in the governmental service, in the sense that the question must be reasonably related to the officer's ability and

fitness to perform his official duties. See, e.g., *Gayer* v. *Schlesinger,* 490 F. 2d 740 (D. C. Cir. 1973); *Wishart* v. *McDonald,* 500 F. 2d 1110, 1115 (1st Cir. 1974). See generally, *Seattle Police Officers' Guild* v. *Seattle,* 80 Wash. 2d 307 (1972); *Davenport* v. *Fire & Police Commrs. of Peoria,* 2 Ill. App. 3d 864 (1972); *Riley* v. *Police Commrs. of Norwalk,* 147 Conn. 113 (1960); *Matter of Appeal of Emmons,* 63 N. J. Super. 136 (1960).

Having determined that the activities in Rhode Island were a proper subject of official inquiry we turn now to the determination whether the questions were sufficiently, narrowly and directly related to the specific matter under investigation. We think that the questionnaire meets these criteria. The questions asked were directly and factually related to events occurring at the inn and the parade; they were designed to aid in the writing of a narrative report by the officers involved.

The plaintiffs contend, however, first, that since the questionnaire was directed to all of the approximately 140 officers listed as absent from the duty roster, some of whom were not in Rhode Island, the questionnaire was not properly limited and constituted a fishing expedition. Second, the plaintiffs contend that before an officer may be required to answer a questionnaire of this type, the commissioner must affirmatively demonstrate that the activity to be investigated "affected . . . [the officer's] public employment in some way."

With respect to the first argument, it is our opinion that the order was as narrowly limited as it reasonably could be. Ninety officers were in Rhode Island; it would be patently absurd to say that the commissioner could not seek to identify those ninety officers by ascertaining which of a possible class of 140 comprised that ninety.

Our discussion of the permissible breadth of inquiry above, resting as it does on the standard that the inquiry reasonably relates to the officer's ability to perform his official function, in large measure answers the plaintiff's

second contention. We think this inquiry was reasonably related to determining the judgment and "fitness" of these men as police officers. While the plaintiffs assert that no criminal charges were pressed, that is not dispositive of the issue. From the record it appears that certain of the men involved could have been charged with criminal offenses. In any event, there were complaints which tended to show that the conduct of certain of those police officers who stayed at the inn was decidedly less than the discipline and order one would expect from officers representing the Boston police department or any other. We are assured in our judgment that this was an isolated and totally unrepresentative occurrence and that not all officers present in Rhode Island participated in the activity. Nevertheless, the commissioner should be (see fn. 1) and is properly investigating the matter.

With respect to the privacy claim under G. L. c. 214, § 1B,[5] we simply state, as did the United States Court of Appeals in *Wishart* v. *McDonald*, 500 F. 2d 1110, 1113-1114 (1st Cir. 1974), "The right of privacy, even as advocated in Warren & Brandeis, The Right to Privacy, 4 Harv. L. Rev. 193 (1890), may be surrendered by public display."

*Judgment affirmed.*

---

[5] General Laws c. 214, § 1B, inserted by St. 1973, c. 941, provides: "A person shall have a right against unreasonable, substantial or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages."