**Peter Mark JONES, Plaintiff,**

v.

**Michael TAIBBI et al., Defendants.**

**Civ. A. No. 79–821–T.**

United States District Court,
D. Massachusetts.

March 5, 1981.

---

Martin C. Gideonse, Cambridge, Mass., for plaintiff.

John T. Williams, Richard G. Pichette, Haussermann, Davison & Shattuck, and M. Robert Dushman, Brown, Rudnick, Freed & Gesmer, Boston, Mass., for defendants Michael Taibbi and Boston Broadcasters, Inc., d/b/a Channel 5.

Marilyn L. Hotch, Robert V. Greco, Asst. Attys. Gen., Boston, Mass., for defendant William Bergen.

Robert W. Meserve, Michael J. Liston, Palmer & Dodge, Boston, Mass., for defendant American Broadcasting Co., Inc. d/b/a ABC.

Andrew J. McElaney, Nutter, McClennen & Fish, Boston, Mass., for defendants Gary LaPierre and Westinghouse Broadcasting Co., d/b/a WBZ–TV, Channel 4.

## OPINION

TAURO, District Judge.

This case arises out of a series of news telecasts on WCVB–TV (Channel 5) in Boston implicating plaintiff (Jones) in certain murders that took place in Los Angeles roughly three years ago. Citing these broadcasts, plaintiff seeks to recover for defamation, invasion of privacy, and infringement of his civil rights under 42 U.S.C. § 1983. At issue here are the motions of defendants Channel 5, and its newscaster Michael Taibbi, for summary judg-

ment, and the American Broadcasting Company's (ABC) motion to dismiss.[1]

## I.

The latter part of 1977 and early part of 1978 witnessed a bizarre series of Los Angeles murders, commonly referred to as the "Hillside stranglings." National attention was focused on the resulting investigation conducted by the Los Angeles Police Department (LAPD).

During this period, defendant Taibbi served as investigative reporter for defendant Channel 5. In late February of 1978, Taibbi learned from a prison guard that an MCI–Walpole inmate named George Shamshak had some connection with, or knowledge about, the Hillside murders. The substance of Shamshak's story was that plaintiff Jones had perpetrated two or three of the murders. At about the same time, William Bergin,[2] a Massachusetts state trooper, learned of Shamshak's allegations and communicated them to the LAPD. Bergin then informed Taibbi that two LAPD detectives had come to Massachusetts to interview Shamshak. That, in turn, prompted Taibbi to contact the LAPD's Strangler Investigation Squad. Taibbi and the LAPD struck a bargain. Taibbi agreed not to publicize what he knew about Jones' alleged involvement, so as not to disrupt the investigation. In return, the LAPD promised to allow Taibbi to film the arrest of Jones, if made.

The scene then shifted to California. The LAPD placed Jones, a janitor in a Los Angeles medical building, under constant surveillance. In addition, Shamshak was transferred from Massachusetts to California for more intensive questioning. On March 30, after nearly a month of surveil-lance, the police arrested Jones and conducted a search of his apartment and van. Taibbi, pursuant to his agreement with the LAPD, was on hand with a camera crew to film the arrest. After the arrest, police held Jones on suspicion of involvement in the Hillside murders.

On the 11:00 P.M. newscast of March 30, Channel 5 announced a "major break" in the Hillside case. The anchorperson described the arrest of Jones, and introduced a taped background report prepared by Taibbi. That report told the story of Shamshak and his allegations that he had seen Jones murder at least two, and perhaps three, young women in the back of a moving van. Taibbi reported that four polygraph tests had all supported Shamshak's story, and noted that the Massachusetts police believed that Shamshak's version of the facts "held". The video then cut to interviews Taibbi conducted with a Massachusetts policeman and with Shamshak's mother and sister. All expressed the belief that Shamshak was telling the truth. The telecast then concluded with Taibbi posing several "unanswered questions", some of which cast doubt on Shamshak's credibility.[3]

Over the next few days, Channel 5 telecast follow-up reports on the investigation, some of which contained portions of the film taken by Taibbi's crew at the time of arrest. The 6:00 P.M. newscast on March 31 featured a detailed account of the LAPD's surveillance and arrest of Jones, as well as background on two of the murder victims. The report also contained an interview of LAPD Chief Daryl Gates by Taibbi, in which Gates expressed confidence that at least some of Shamshak's allegations were true. On that same newscast, the anchor-

1. Plaintiff brings the privacy claim against all three defendants, and the defamation and civil rights claims against Taibbi and Channel 5 only.

2. Bergin, also a defendant in the case, is not one of the movants here.

3. Taibbi observed:
   1. George Shamshak might have been a shocked and arguably innocent witness to one homicide, but could he have seen two or three and not have been a participant?
   2. How good a witness is he? For weeks, Task Force investigators have been telling us that he simply knows too much, much more than he could have learned from news accounts of the killings, but that often, on crucial points, he's been way off the mark.
   *Defendants' Exhibit A, at 4–5.*

person asserted that plaintiff had been "charged ... with two counts of first degree murder." Defendants' Exhibit A, at 9. The March 31 telecast continued with a repeat of Taibbi's March 30 background report. It concluded with exculpatory quotes from Jones' former fiancee, and then a brief description of the Massachusetts State Police's role in the investigation.

Central to the complaint here is the fact that the anchorperson erred in his assertion that Jones had been charged with two counts of first degree murder. In fact, he had not been charged with any crime, but was only being held on suspicion.

Subsequent newscasts repeated much of this material, and described the suspicions of Massachusetts and Maine police that Jones might have been involved in slayings in those two states. Beginning on April 1 at 6:00 P.M., the newscasts acknowledged the LAPD's failure to find sufficient corroborating evidence to warrant bringing formal charges. On April 3 at 6:00 P.M., the anchorperson reported that Jones had been released for lack of evidence. Taibbi then explained that, although the investigation was not closed, the LAPD found that Jones "had a solid alibi for one of the nights in question." Defendants' Exhibit A, at 24. Several more newscasts repeated that Jones had been set free for lack of evidence.

Approximately one year later, plaintiff brought this action in Norfolk Superior Court. The complaint claims $3.45 million in damages for violations of plaintiff's civil rights and right to privacy, and for defamation and false imprisonment.[4] Defendants removed the action to this court.

**4.** The false imprisonment claim does not implicate the moving defendants.

**5.** Count IV of the complaint asserts that defendants broadcast plaintiff's arrest and search "after acting in concert with and as agents of the Los Angeles Police Department, and did thereby defame Jones." Plaintiff originally named ABC as a defendant in this count, but later agreed to a dismissal.

**6.** Attempts to charge the media with state action have generally met with a cool reception in the courts. *See, e. g., Belluso v. Turner Com-*

## II.

### A. The Section 1983 Claim

Federal jurisdiction in this case hinges on plaintiff's 42 U.S.C. § 1983 claim against Taibbi and Channel 5. Jones argues that Taibbi and Channel 5 acted as co-conspirators and/or agents of the LAPD in defaming him[5] and violating his privacy when they broadcast the film of his arrest.

Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law....

42 U.S.C. § 1983.

There are two necessary elements of any section 1983 claim:

First, the plaintiff must prove that the defendant has deprived him of a right secured by the 'Constitution and laws' of the United States. Second, the plaintiff must show that the defendant deprived him of this constitutional right 'under color of law.'

*Adickes v. Kress*, 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970). Plaintiff's section 1983 claim lacks the second of these elements, as the defendants did not act under color of state law.

In exceptional circumstances, private parties may be deemed to have acted under color of state law.[6] But there are no

*munications Corp.*, 633 F.2d 393 (5th Cir. 1980); *Chicago Joint Bd., Amal. Wkrs. v. Chicago Tribune Co.*, 435 F.2d 470, 473-78 (7th Cir. 1970), *cert. denied*, 402 U.S. 973, 91 S.Ct. 1662, 29 L.Ed.2d 138 (1971); *Sheppard v. E. W. Scripps Co.*, 421 F.2d 555, 556 (6th Cir.), *cert. denied sub. nom. Strickland, Executrix v. E. W. Scripps Co.*, 400 U.S. 941, 91 S.Ct. 238, 27 L.Ed.2d 245 (1970); *Keen v. Philadelphia Daily News*, 325 F.Supp. 929, 930 (E.D.Pa.1971); *Cook v. Advertiser Co.*, 323 F.Supp. 1212, 1214 (M.D.Ala.), *aff'd*, 458 F.2d 1119 (5th Cir. 1972).

exceptional circumstances here that would warrant a finding of state action. The only concerted action between the defendants and the state was Taibbi's agreement not to disclose what he knew about Jones until, if ever, Jones was arrested by the LAPD. In return, Taibbi would be permitted to film the arrest. Taibbi was not an informer. Indeed, the LAPD already knew what he knew. In what was at least arguably an exercise of responsible restraint, Taibbi agreed to defer telecasting what was known to both him and the authorities until the LAPD felt it was warranted in seeking an arrest. On these facts, there was no delegation of an essential public function by the state to a private party, *see Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), nor do the facts demonstrate any "symbiotic relationship" between the state and the defendants that would bring the broadcasters' acts within the scope of section 1983. *See Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).[7]

Plaintiff's most persuasive argument relies on a line of cases attaching section 1983 liability to private parties who are "willful participant[s] in joint activity with the State or its agents." *See Adickes v. Kress*

& *Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970); *United States v. Price*, 383 U.S. 787, 794, 86 S.Ct. 1152, 1156, 16 L.Ed.2d 267 (1966).[8] The theory is that the agreement between Taibbi and the LAPD amounted to an "unholy alliance".[9] The facts, however, demand a contrary conclusion. Taibbi merely agreed not to disclose Jones's alleged involvement prematurely. At most, his motive was to get a better story later—the arrest. His inaction does not transmute to state action merely because it permitted the LAPD to continue its surveillance, unbeknownst to Jones and the public. Nor does the fact that Taibbi's restraint earned him a front line vantage point at the arrest make him an agent of the state. The LAPD did not play any role in determining what Taibbi would film or later telecast. Taibbi had no part in the determination as to whether or when Jones would be arrested. Although both LAPD and Taibbi had an interest in Jones, their respective motives were disparate. Taibbi and the LAPD had a coincidence of interest in the plaintiff as a suspect, but not the concert of involvement that would transform Taibbi's telecast from a private venture to action taken under color of state law.[10]

---

7. Even a "considerable degree of cooperation" between a private party and the state does not, standing alone, justify a finding that the challenged action, in this case a telecast, occurred under color of state law. *See Rendell-Baker v. Kohn*, 641 F.2d 14, at 24 (1st Cir. Feb. 12, 1981).

8. In *Adickes*, a white school teacher brought a § 1983 action against a Hattiesburg, Mississippi restaurant, alleging that defendant had conspired with the local police to refuse her service because she was a "Caucasian in the company of Negroes." 398 U.S. at 147, 90 S.Ct. at 1602. The Court denied defendant's motion for summary judgment, finding triable facts bearing on whether defendant and the police "had a 'meeting of the minds' and thus reached an understanding that [plaintiff] should be refused service." *Id.* at 158, 90 S.Ct. at 1608.

   *Price* involved a dismissal of an indictment under 18 U.S.C. § 242, the criminal analogue to § 1983. The indictment alleged that the Deputy Sheriff of Neshoba County, Mississippi had arranged with seventeen other official defendants to release three men from county jail and then capture and kill them. The Court refused

to dismiss the indictment as against the nonofficial defendants. Justice Fortas found that the indictment charged a "brutal joint venture" of which "[s]tate officers had participated in every phase." 383 U.S. at 795, 86 S.Ct. at 1157.

9. Plaintiff's Brief in Opposition to Defendants' Motions for Summary Judgment, at 17.

10. *Cf. Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 173, 92 S.Ct. 1965, 1971, 32 L.Ed.2d 627 (1972) (where impetus for racial discrimination is private, state action occurs only when state has "significantly involved itself with invidious discrimination").

   Courts have generally equated Fourteenth Amendment "state action" with action "under color of state law." *See, e. g., Briley v. California*, 564 F.2d 849, 855 (9th Cir. 1977); *Greco v. Orange Memorial Hospital*, 513 F.2d 873, 877 n. 7 (5th Cir. 1975); *Perez v. Sugarman*, 499 F.2d 761, 764 (2d Cir. 1974).

   The Fourth Circuit recently adopted a somewhat different analysis in *Lugar v. Edmondson Oil Co., Inc.*, 639 F.2d 1058 (1981). In that case, plaintiff brought a § 1983 suit against a creditor whose ex parte invocation of state

Plaintiff's theory would, in effect, "deputize" news persons like Taibbi merely because his decision to postpone publication was of some ancillary benefit and assistance to the police. The typical "at large" reporter routinely learns details pertaining to ongoing police investigations. The decision as to whether or when to publish that information is often difficult and sensitive. On the one hand is the concern that a competitor will scoop you. On the other, is the selfless recognition that premature publication could alert the targets of the investigation, thereby aborting a painstaking police effort and perhaps endangering the safety of law enforcement personnel.

Defendant Taibbi, confronted with this dilemma, pursued a sensible course—he contacted the police, determined the information was sensitive, and agreed to delay publication. The decision to delay was Taibbi's alone and not that of the police. It was made after he balanced his First Amendment responsibilities as a reporter with his at least equally compelling responsibilities as a citizen. To reward Taibbi's exercise of discretion by subjecting him to liability under federal civil rights laws would establish a precedent inconsistent with the public interest, which includes both a right to know, .and a right to effective law enforcement.[11]

The motions of Taibbi and Channel 5 for summary judgment are allowed with respect to plaintiff's claim under 42 U.S.C. § 1983. An order will issue.

### B. The State Law Claims

The insufficiency of plaintiff's section 1983 claim raises doubts about whether this court should exercise pendent jurisdiction over the defamation and invasion of privacy claims against Taibbi and Channel 5, as well as the privacy claim against ABC, all of which involve solely state law questions. Pendent jurisdiction is a "doctrine of discretion." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). But *Gibbs* also admonishes that,

> if the federal claims are dismissed before trial even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

*Id.*

That is precisely the circumstance here. The federal claim has been dismissed. This court has undertaken no substantial analysis of the pendent claims, so their dismissal will not have wasted judicial energy or resources. Moreover, adjudication of the state claims urged by plaintiff would send this court on an expedition into largely uncharted areas of state law.[12] Federalism

---

prejudgment attachment procedures resulted in a levy upon plaintiff's property. The court found that although the acts of the state court clerk and county sheriff amounted to state action, they did not suffice to charge the creditor with acting under color of state law. A private party acted under color of state law, the court reasoned, only when it usurped or was given so much official power that the independence of the official was compromised to a significant degree.

Even under this approach, Jones's § 1983 claim would be insufficient. Taibbi had no control over whether or when plaintiff would be arrested. Similarly, the LAPD was not involved in Taibbi's decision to cover the story, or the decision of Channel 5 to telecast Taibbi's coverage either in whole or in part.

**11.** *See Belluso v. Turner Communication Corp.*, 633 F.2d 393 (5th Cir. 1980) (holding that government regulation of broadcasting does not transform private broadcasters into governmental entities and noting that broadcasters

enjoy wide discretion over the content and format of their programming).

**12.** This is especially true with regard to the privacy claim. The relatively few decisions handed down by Massachusetts courts so far have resisted establishing broad legal principles, focusing instead on the particular facts at hand. *See Hastings & Sons Publishing Co. v. City Treasurer*, 374 Mass. 812, 375 N.E.2d 299, 304 (Mass.1978) ("Without delineating the precise scope of the right or privacy afforded by G.L. c. 214, § 1B, we can state with confidence that disclosure of these payroll records would not constitute an unreasonable, substantial or serious interference with [that right]"); *Broderick v. Police Commissioner of Boston*, 368 Mass. 33, 330 N.E.2d 199, 206 (Mass.1975) (policemen accused of disruptive conduct during Law Day celebration could be required to answer written questions about the alleged incidents, inasmuch as they had "surrendered [their right of privacy] by public display."), *cert. denied*, 423 U.S. 1048, 96 S.Ct. 773, 46

is best served by permitting the Massachusetts courts to formulate the basic legal principles and balance the state policies surrounding these state causes of action.

The defamation and invasion of privacy claims against all three defendants are, therefore, remanded to the Massachusetts Superior Court. An order will issue.

L.Ed.2d 636 (1976); *Cefalu v. Globe Newspaper Co.*, 79 Mass.App.A.S. 1437, 391 N.E.2d 935, 939 (Mass.App.1979) ("Whatever conduct may rise to a violation of this statute, the publication of the photograph of a line of people in a government building is not it. . . . The appearance of a person in a public place necessarily involves doffing the cloak of privacy which the law protects."), *appeal dismissed*, 444 U.S. 1060, 100 S.Ct. 994, 62 L.Ed.2d 738 (1979); *Commonwealth v. McDuffee*, 79 Mass.App.A.S. 288, 386 N.E.2d 754, 758 (Mass.App.1979) (required disclosure of pending indictment on application for renewal of insurance broker's license did not constitute unreasonable, substantial, or serious interference with privacy), *rev'd on other grounds*, 79 Mass.App.A.S. 2631, 398 N.E.2d 463 (1979).

The basic principles applicable to the defamation cause of action are much better established. *See Stone v. Essex County Newspapers, Inc.*, 367 Mass. 765, 330 N.E.2d 161 (Mass.1975). But the core of plaintiff's defamation claim is his contention that defendants "endorsed" Shamshak's story and are therefore responsible for its content. There seems to be no Massachusetts precedent relevant to this theory of endorsement.

A factor unique to the radio and television media, Federal Communications Commission (FCC) regulatory requirements, may be considered relevant by the Massachusetts courts in determining the reasonableness of defendants' care under the circumstances of this case. Unlike the print media, defendant Channel 5 needs a license to communicate to the public, and that license is granted only if the FCC finds that "public interest, convenience, and necessity would be served thereby." See 47 U.S.C. §§ 307(a), (d). In turn, the breadth and quality of news programming as well as the broadcaster's responsiveness to the needs of the community constitute relevant factors in determining whether the public interest is served. *See Alianza Federal de Mercedes v. FCC*, 539 F.2d 732, 739 (D.C.Cir.1976); *Robinson v. FCC*, 334 F.2d 534, 536 (D.C.Cir.1964). The public has come to expect instant and on the spot coverage of major news events. The demands of such public service coverage require at least a reassessment of traditional notions of libel law and their applicability to "on the spot, live, instant news coverage." It is one thing to require a newspaper to check the accuracy of an interview. But it may be another matter to hold a TV newsperson responsible for the spontaneous live utterance of an interviewee. Although this case involves the statements of a TV reporter, not an interviewee, concern as to the general standard to be applied nonetheless permeates the case.