**Robert E. GUINEY, individually and as he is President and Representative of the Boston Police Patrolmen's Association, Inc., Plaintiff,**

v.

**Francis M. ROACHE, as he is Police Commissioner of the City of Boston, Defendant.**

Civ. A. No. 86–1346–K.

United States District Court, D. Massachusetts.

May 18, 1988.

Frank J. McGee, McGee & Phillips, Marshfield, Mass., for plaintiff.

Michael D. Powers, Johnson, Mee, & May, James F. Hart, Boston Police Hdqtrs., Joseph I. Mulligan, Law Dept., City Hall, Boston, Mass., for defendant.

Marjorie Heins, John Reinstein, Boston, Mass., for Mass Civil Liberties Union, amicus curiae.

Robert J. Cynkar, Deputy Asst. Atty. Gen., Richard Greenberg, Mary Goetten, Brian G. Kennedy, Dept. of Justice, Civil Div., Washington, D.C., amicus curiae.

## OPINION

KEETON, District Judge.

Plaintiff challenges Boston Police Department Rule 111, as amended, which authorizes urinalysis drug testing of department employees on both a reasonable suspicion and a random basis. Plaintiff seeks (1) a declaratory judgment that the Rule's random testing provision violates the Fourth Amendment as incorporated by the Fourteenth Amendment and (2) equitable relief temporarily and permanently enjoining its enforcement. By agreement of the parties, the court bypassed hearings on plaintiff's prayer for preliminary relief and proceeded directly to non-jury trial of the entire case.

Trial commenced on October 1, 1986, and on that same day the evidence was closed. There followed a motion of plaintiff to reopen the evidence. The court convened a conference on December 15, 1986, at which time a further stipulation was filed and the evidence was closed.

In a reported opinion dated March 6, 1987, the court denied plaintiff's prayer for preliminary relief and dismissed this action on grounds of abstention without prejudice on the merits. *Guiney v. Roache*, 654 F.Supp. 1287 (D.Mass.1987). Plaintiff appealed. The First Circuit held that this court erred in the abstention ruling, *Guiney v. Roache*, 833 F.2d 1079 (1st Cir.1987),

and in its mandate dated December 2, 1987, vacated and remanded the cause to this court for "further proceedings."

After consultation with counsel, and with no argument to the contrary having been made, this court determined that the mandate did not require a new trial if all material issues could be resolved in "further proceedings" supplemental to the trial already held. The parties were invited to supplement their previous submissions to reflect any changes in material facts or law since December 15, 1986. The parties chose not to supplement the factual record; however, both plaintiff and defendant submitted further memoranda of law and reply briefs. (Docket Nos. 63, 64, 66, 68). In addition, the Massachusetts Chiefs of Police Association submitted a brief as *amicus curiae*. (Docket No. 69). Oral arguments were then heard on May 13, 1988.

## I.

The evidence before the court consists principally of Rule 111 and a stipulation, as twice amended, by which the parties agreed on a statement of the material facts. The entire text of the rule and of this stipulation is reproduced in the March 6, 1987 Opinion of the court. *See Guiney,* 654 F.Supp. at 1289–94. Those portions of the stipulation most critical to the resolution of the dispute are as follows.

Rule 111 requires Boston police officers to submit to urine testing for illegal drug use both on a reasonable suspicion basis and on a random, without cause, basis. Officers to be tested without cause will be selected by a randomized independent computer program. Those individuals selected will perform their bodily functions in private and unobserved. The specimens collected will be tested twice. The initial test shall use a thin-layer chromatography process. The secondary confirmation test of any positive findings shall use either enzyme immunoassay, gas or liquid chromatography, or mass spectrometry. Final confirmation of the presence of drugs in the urine sample of an officer sets in motion the Civil Service laws of the Commonwealth, under which the officer is entitled to full hearings at which he or she has the opportunity to present a complete legal defense and exculpatory evidence.

## II.

By its terms, the Fourth Amendment prohibits only *unreasonable* searches and seizures. In order to determine whether there has been a violation of the Fourth Amendment, a court must proceed in two steps. First, the court must determine that government conduct constitutes a search and seizure by infringing a legitimate expectation of privacy. Second, if a search and seizure occurred, the court must determine whether it was reasonable.

■ No extended discussion of the first step is required. Urinalysis drug testing is a search and seizure within the meaning of the Fourth Amendment. The federal and state courts that have ruled on the constitutionality of urinalysis drug testing have been virtually unanimous in this conclusion. *See National Federation of Federal Employees [NFFE] v. Weinberger,* 818 F.2d 935, 942 (D.C.Cir.1987); *National Treasury Employees Union v. Von Raab,* 816 F.2d 170, 176 (5th Cir.1987), *cert. granted,* —— U.S. ——, 108 S.Ct. 1072, 99 L.Ed.2d 232 (1988); *McDonnell v. Hunter,* 809 F.2d 1302, 1307 (8th Cir.1987); *Feliciano v. City of Cleveland,* 661 F.Supp. 578, 584 (N.D. Ohio 1987); *Lovvorn v. City of Chattanooga,* 647 F.Supp. 875, 879 (E.D.Tenn.1986); *Macias v. State,* 649 S.W.2d 150, 152 (Tex. App.1983). Moreover, this conclusion does not turn on whether or not the procedures employed involve direct visual inspection of urination. *NFFE v. Weinberger,* 818 F.2d at 942.

The reasons given for concluding that urinalysis drug testing is a search and seizure are twofold. First, the taking of a urine sample in order to reveal the "personal physiological information" contained therein is a "considerable intrusion upon an individual's reasonable expectation of privacy." *Policemen's Benevolent Ass'n of N.J. v. Washington Township,* 672 F.Supp. 779, 787 (D.N.J.1987); *cf. New Jersey v. T.L.O.,* 469 U.S. 325, 337, 105 S.Ct. 733, 740, 83 L.Ed.2d 720 (1985) (noting that

"even a limited search of the person is a substantial invasion of privacy"). Second, the testing of urine is comparable to the testing of blood, which the Supreme Court found to be a search in *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

### III.

Having concluded in Part II that urinalysis drug testing is a search and seizure within the meaning of the Fourth Amendment, I proceed to address the issue of reasonableness. A search is usually considered to be unreasonable, and a violation of the Fourth Amendment, unless a warrant has been procured or probable cause exists in circumstances associated with one of the narrowly drawn exceptions to the warrant requirement. *Cf. O'Connor v. Ortega,* 480 U.S. 709, 107 S.Ct. 1492, 1501, 94 L.Ed.2d 714 (1987) (plurality opinion of O'Connor, J.) (noting that "[f]or the most part, we have required that a search be based upon probable cause"). Rule 111 provides for two separate programs of urinalysis, one grounded on a basis of individualized, reasonable suspicion—that is, without a warrant and without probable cause—and the other on a random basis.

█ I conclude that a rule requiring police officers to submit to urinalysis drug testing on the basis of individualized, reasonable suspicion does not violate the Fourth Amendment. Plaintiff has not seriously challenged this portion of Rule 111, recognizing the trend upholding the constitutionality of urinalysis drug testing of public employees (particularly police officers) based on individualized, reasonable suspicion. *See Railway Labor Executives' Assoc. v. Burnley,* 839 F.2d 575, 589 (9th Cir.1988); *Feliciano,* 661 F.Supp. at 587–90; *Lovvorn,* 647 F.Supp. at 882–83; *Capua v. City of Plainfield,* 643 F.Supp. 1507, 1516 (D.N.J.1986). A warrantless search under these circumstances is well supported in analogous precedents. In *T.L.O.,* the Court reasoned that no warrant is needed if " 'the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search.' "

*T.L.O.,* 469 U.S. at 340, 105 S.Ct. at 742 (citing *Camara v. Municipal Court,* 387 U.S. 523, 533, 87 S.Ct. 1727, 1733, 18 L.Ed. 2d 930 (1967)). Where the purpose of the search is to detect illegal substances in the body, it is undisputed that the delay of obtaining a warrant could frustrate that purpose. *See Washington Township,* 672 F.Supp. at 785; *cf. Schmerber,* 384 U.S. at 770–71, 86 S.Ct. at 1835–36.

As to the more difficult issue of the reasonableness of a search on a less-than-probable-cause basis, two reasons have been forwarded in support of the individualized, reasonable suspicion standard. First, in a plurality opinion addressing the appropriate standard for a search conducted by a public employer in order to investigate work-related employee misfeasance, the Supreme Court determined that probable cause is not required. *O'Connor,* 107 S.Ct. at 1501. Second, the state's legitimate interest in the efficient and safe operation of police work is strongly implicated where there is reasonable suspicion that a police officer is performing his or her duties under the influence of drugs. This strong interest outweighs the officer's reasonable expectation of privacy. *Cf. Burnley,* 839 F.2d at 589 (stating that, "[a]lthough body fluid testing is highly intrusive, if it were occasioned only by individual suspicion, the intrusion would not be excessive in light of the nature of the suspected rule violation").

### IV.

The focus of plaintiff's challenge to Rule 111 is on the reasonableness of *random* drug testing. This challenge presents a very serious issue.

█ "[T]he requirement that the government treat individuals as individuals and not as faceless and fungible members of a class lies at the very core . . . of the Fourth Amendment. . . ." *Duarte v. Healey, Memorandum and Order on Motions for Summary Judgment and Dissolution of a Preliminary Injunction,* C.A. No. 85–4429, slip op. at 19 (Ma.Super.Ct. May 20, 1987). Some measure of individualized suspicion is generally a prerequisite to a constitutional

search and seizure, even in areas where the government has a great need. *See National Federation of Federal Employees [NFFE] v. Carlucci,* 680 F.Supp. 416, 431 (D.D.C.1988); Bookspan, *Behind Open Doors: Constitutional Implications of Government Employee Drug Testing,* 11 Nova L.R. 307, 341 (1987). Although the Supreme Court has not made individualized suspicion an absolute prerequisite to a valid search, exceptions to the requirement of individualized suspicion have been upheld only where the privacy interests implicated by the search were minimal and where safeguards guaranteed that the individual's reasonable expectation of privacy was not subject to the discretion of government officials. *See T.L.O.,* 469 U.S. at 342 n. 8, 105 S.Ct. at 743 n. 8. At the least, the Fourth Amendment requires a "heavy presumption" against searches not based on reasonable suspicion, which presumption can be overcome only by a compelling government interest. *NFFE v. Carlucci,* 680 F.Supp. at 431.

■ Recognizing this presumption, most courts that have addressed the issue have held that random drug searches violate the Fourth Amendment. *See Washington Township,* 672 F.Supp. at 794 (noting the "trend within the judiciary" to require individualized, reasonable suspicion before a public employee may be drug tested); Bookspan, *Behind Open Doors,* 11 Nova L.R. at 341 (concluding that "most recent judicial opinions disfavor random employee drug screening"). Indeed, every reported decision located by the court regarding the constitutionality of random or mass drug testing *of police officers* has determined that the practice violates the Fourth Amendment. *See Washington Township,* 672 F.Supp. 779 (D.N.J.1987); *Feliciano,* 661 F.Supp. 578 (N.D.Ohio 1987); *Bostic v. McClendon,* 650 F.Supp. 245 (N.D.Ga. 1986); *Penny v. Kennedy,* 648 F.Supp. 815 (E.D.Tenn.1986); *Capua,* 643 F.Supp. 1507 (D.N.J.1986); *Caruso v. Ward,* 133 Misc.2d 544, 506 N.Y.S.2d 789 (N.Y.Sup.Ct.1986); *Palm Bay v. Bauman,* 475 So.2d 1322 (Fla.App.1985). I conclude, consistently with the cases cited above, that Rule 111 is unconstitutional to the extent that it authorizes random urinalysis of Boston police officers.

To determine the reasonableness of random drug testing a court must weigh "the need to conduct a random drug search against the resulting invasion of the police officers' expectation of privacy." *Washington Township,* 672 F.Supp. at 786.

Urinalysis drug testing strongly infringes upon a police officer's legitimate expectation of privacy. "As measured by the expectation of privacy, inspections of personal effects are generally least intrusive, while breaches of the 'integrity of the body' result in the greatest invasion of privacy." *Capua,* 643 F.Supp. at 1514. Simply put, drug testing is very intrusive. It requires that one's bodily fluids be turned over to the government for analysis, even though they contain information concerning not only one's use of drugs but also such other matters as whether one is pregnant or suffers from any of a large assortment of diseases detectable by such testing. *See* Joseph, *Fourth Amendment Implications of Public Sector Work Place Drug Testing,* 11 Nova L.R. 605, 635 (1987). As the court put it in *Capua,* "[d]rug testing is a form of surveillance, albeit a technological one." *Capua,* 643 F.Supp. at 1511.

In his brief and in Rule 111 itself, defendant has identified two primary interests argued to outweigh the harm from the serious invasion of the police officers' expectation of privacy. They are: the government's interest in (1) the integrity of the police force and (2) a safe and efficient police department.

■ Defendant argues that the city's interest in the "integrity" of the police force is a compelling one because there is a strong need to detect and prevent even the off-duty use of drugs by police officers. The need arises, it is argued, because an officer who uses drugs may be susceptible to bribery or to a temptation to divert seized drugs. In addition, it is argued that even the possibility of drug use by police officers undermines public confidence in

the police force, which in turn undermines the ability of the force to perform its job.

The shortcoming of the integrity argument is that, without factual support, it proves too much. The exact same argument could be made as to any breach of law or the public trust. For example, *if* many police officers received stolen property off duty, this fact would make them susceptible to bribery, tempt them to divert seized property, and undermine the confidence of the public in the police force. Nevertheless, it has never been suggested that random searches of the homes of police officers would survive constitutional scrutiny. Before a court can even begin an informed weighing of the government's "integrity" interest in conducting a search against the infringement of the privacy interests contemplated by urinalysis, the court must be able to make a determination that the factual predicate for the parade of horrors exists. I cannot make that determination on the record before me, either as an adjudicative fact finding or as a nonadjudicative fact determination.

The burden on defendant to establish the factual predicate for its argument might be satisfied either (1) by evidence that circumstances distinctive to the Boston police department make drug abuse a significant problem, or (2) by a showing that drug abuse is a problem in police departments generally throughout the Commonwealth of Massachusetts or throughout the United States because of facts common to such departments. *Cf. Feliciano*, 661 F.Supp. at 587–88. As I noted in my Opinion of March 6, 1987, a showing of the first type, seeking an adjudicative fact finding by this court, has not been seriously attempted in this case. *Guiney*, 654 F.Supp. at 1300. No evidence proffered at trial or during the recent opportunity to supplement the factual record supports an adjudicative fact finding of such a drug abuse problem in the Boston police department.

Defendant's effort to establish a factual basis for its integrity argument rests on the last showing described above—that a drug abuse problem exists in police departments throughout the United States. Rule 111 itself cites the "national epidemic in the illicit use of drugs." Such a determination by this court would stand as a precedent and not merely as a fact finding applicable only to the case at hand. *See id.* at 1301. A nonadjudicative determination that a national drug abuse problem exists (though not as applied to police departments) has been made, at least implicitly, by several other courts. *See id.* (and cases cited therein). Even if (based on the implicit determinations in several reported opinions) I assume the existence of a national drug problem, however, I am unable to determine that drug abuse is a widespread problem *in police departments* throughout the United States (or that the Police Commissioner's nonadjudicative determination of the existence of such a problem is supportable).

The integrity of the Boston police department is called into question only to the extent that police officers are suspected of abusing drugs. A determination that many members of society at large abuse drugs would compel a like conclusion as to police officers only if society and police officers are alike with respect to whether, though as a whole composed largely of law abiding persons, each group includes a percentage of drug offenders sufficient to be material to the constitutional issues presented by random drug testing. The evidence is to the contrary. Despite the intensive media attention devoted to drug abuse, defendant has proffered no evidence that *any* police department in the nation suffers from a drug abuse problem. The fact that all cases addressing the issue of random drug testing of police officers have determined the practice to be unconstitutional, *see supra* p. 960, suggests that neither precedent nor any other basis exists for the court to make a nonadjudicative determination sufficient to sustain defendant's contention. Similarly, and more precisely in point, there is no basis for the court to make a determination that the Police Commissioner's nonadjudicative determination is supportable. At minimum, in order for Rule 111 to be upheld as constitutional the Police Commissioner must have a rational basis for determining that police departments generally in-

clude, or the Boston Police Department in particular includes, a percentage of drug offenders sufficient to be material to the constitutional issues presented. As previously stated, *no* basis has been shown to support either of these determinations by the Commissioner.

■ There is no denying that the government has a compelling interest in preventing police officers from working under the influence of drugs. Because of the nature of police work, this interest exceeds even the generally recognized interest of any employer in an efficient work force. The weight of this argument in the present context, however, is reduced by two considerations.

First, the fit between random urinalysis and the goal of work safety and efficiency is tenuous. Urinalysis drug testing is not capable of showing whether an individual is impaired by drugs or under the influence of drugs. *Burnley*, 839 F.2d at 588–89; *NFFE v. Carlucci*, 680 F.Supp. at 428–29; Joseph, *Fourth Amendment Implications of Public Sector Work Place Drug Testing*, 11 Nova L.R. 605, 632 (1987). Indeed, in the context of arguing for the "deterrent" value of random urinalysis, the defendant states that "random testing is effective ... because its aim is to detect chronic abusers rather than actual impairment." Brief of Defendant (Docket No. 64) at 5. The reason urinalysis is incapable of measuring impairment is that, for the most commonly abused drugs (cocaine and marijuana), urinalysis detects the presence not of the drug but of a drug metabolite—an inactive product resulting from the body's breakdown of a drug. Metabolites may appear in urine for several days, even weeks, after exposure to the drug. *Cf. NFFE v. Carlucci*, 680 F.Supp. at 428.

Second, the government's interest in preventing police officers from working under the influence of drugs is well served by allowing testing on a reasonable suspicion basis, which is "already a significant concession of deference to the state's legitimate interests." *Capua*, 643 F.Supp. at 1518. Government employees such as police officers are under constant observation

by superiors and co-workers, and one working under the influence of drugs would show signs upon which a case on reasonable suspicion could be built. Thus, the state's interest in safety and efficiency on the job "will not be significantly impaired by [requiring satisfaction of] the individualized reasonable suspicion standard." *Id.;* see also *Washington Township*, 672 F.Supp. at 790. The additional protection (against an officer's being impaired while on duty) to be gained by random tests is marginal.

The court's conclusion as to the marginal effectiveness of random drug testing where drug testing is already conducted on a reasonable suspicion basis could be rebutted, perhaps, by a showing sufficient for the court to make an adjudicative finding that reasonable suspicion testing *has not* been effective in preventing police officers of a particular police force from working under the influence of drugs. *Cf. Transport Workers' Union of Philadelphia v. Southeastern Pennsylvania Transp. Authority*, 678 F.Supp. 543 (E.D.Pa.1988) (upholding random drug tests of certain transportation authority employees upon an adjudicative finding of "compelling evidence of a current drug and alcohol problem unlikely to be solved by less aggressive measures"). Defendant has not seriously attempted to make such a showing. As I noted above, at page 961, defendant has not attempted to show that there is any on or off duty drug abuse problem in the Boston police department.

## V.

As the court noted in *NFFE v. Carlucci*, it is not easy to line up and explain on a single coherent theory all of the many cases decided by federal and state courts on the difficult subject of random drug testing. *NFFE v. Carlucci*, 680 F.Supp. at 435. It would not be profitable even to attempt that feat here. Nevertheless, because the subject is such an important one, two of the major arguments advanced in support of random drug testing are addressed in this Part.

■ The first major argument is suggested by *Shoemaker v. Handel*, 795 F.2d 1136 (3d Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986), which upheld New Jersey Racing Commission Regulations authorizing random drug tests of jockeys (and others) in the horse-racing industry. The *Shoemaker* court determined that the horse-racing industry in New Jersey was a highly-regulated one within the meaning of the administrative-search exception to the warrant requirement (and to an individualized suspicion requirement) and proceeded to decide that the administrative-search exception may extend to the warrantless testing of *persons* engaged in regulated activity. *Id.* at 1142. Finally, the *Shoemaker* court determined that the two requirements justifying the warrantless administrative-search exception had been met—New Jersey has a "strong state interest in conducting an unannounced search" and the pervasive regulation of the horse-racing industry "reduced the justifiable privacy expectation of the subject of the search." *Id.* at 1142. (More recently, the Eighth Circuit upheld random drug testing of nuclear power plant employees as within the administrative-search exception articulated in *Shoemaker. See Rushton v. Nebraska Public Power District*, 844 F.2d 562 (8th Cir. 1988).)

There are three reasons why I conclude that the random drug testing of Boston police officers does not fall within the administrative-search exception. First, unlike jockeys in the New Jersey horse-racing industry (or employees in the nuclear-power industry), police officers in Massachusetts do not work in a highly-regulated industry within the meaning of the administrative-search exception. Indeed, the police force "industry" is not regulated at all, perhaps because it does not pose a danger to the community like that of mining, *cf. Donovan v. Dewey*, 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981), or of the sale of firearms and ammunition, *cf. United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972). The only regulations imposed upon Boston police officers are those stemming directly from their sta-

tus as employees of the city. If this type of regulation were sufficient to trigger the administrative-search exception, then *every* government employee would find his or her expectations of privacy diminished to the same degree as the owner of a gun shop or the operator of a coal mine. *Cf.* Kamisar, *The Fourth Amendment in an Age of Drug and Aids Testing*, 32 Law Quadrangle Notes 40, 43 (Fall 1987) (noting that " '[a]dministrative search' is swarming around the Fourth Amendment like bees. And the drone may soon become deafening."). The Supreme Court precedents do not support such a sweeping proposition. For these reasons, courts have explicitly stated that police officers do not work in a highly-regulated industry. *See Washington Township*, 672 F.Supp. at 786–87; *Fraternal Order of Police v. Newark*, 216 N.J.Super. 461, 524 A.2d 430, 434–35 (1987).

Second, absent Supreme Court or First Circuit authority, I would not conclude that the administrative-search exception applies to searches of *employees* in highly-regulated industries. In both *Donovan* and *Biswell*, the Supreme Court stressed the diminished threat to privacy involved in "inspections of commercial property." *Donovan*, 452 U.S. at 598–99, 101 S.Ct. at 2538–39; *Biswell*, 406 U.S. at 317, 92 S.Ct. at 1597. In contrast, the intrusion on an individual's expectation of privacy is very great in the context of urinalysis drug testing. *See supra* pp. 960–61.

Third, I find that the first requirement justifying the administrative-search exception—the requirement of a "strong state interest in conducting an unannounced [and random] search"—is not met in the present case. For the reasons stated above at page 962, the defendant has failed to establish that legitimate state interests are furthered to a significantly greater extent by random searches where searches based on reasonable suspicion have been authorized.

■ The second major argument I address is defendant's argument that police officers in Massachusetts have a significantly diminished expectation of privacy, and, as a result, Rule 111 is reasonable

despite the absence of a compelling state justification. Although language in some opinions of the First Circuit and of Massachusetts' courts may appear on first reading to support defendant's argument, closer scrutiny of the precedents leads me to conclude that they do not support the position that Massachusetts police officers enjoy a lesser expectation of privacy within the meaning of the Fourth Amendment.

Defendant relies primarily on *O'Brien v. DiGrazia,* 544 F.2d 543 (1st Cir.1976), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977), and *Broderick v. Police Comm'r of Boston,* 368 Mass. 33, 330 N.E. 2d 199 (1975), *cert. denied,* 423 U.S. 1048, 96 S.Ct. 773, 46 L.Ed.2d 636 (1976). In *O'Brien,* the First Circuit found that plaintiff-appellants (police officers) failed to state a claim for violation of their constitutional rights where the Commissioner had ordered them to complete a detailed financial questionnaire. Plaintiffs attacked the questionnaire primarily as an invasion of privacy, not as a violation of their Fourth Amendment rights. *O'Brien,* 544 F.2d at 545. In addressing the Fourth Amendment issue, the court stated only that "even if the Fourth Amendment applies to this sort of intrusion, the Commissioner's order is not so lacking in justification as to be an 'unreasonable' invasion of the patrolmen's 'legitimate expectation of privacy.'" *Id.* at 546. Thus, the *O'Brien* court did not decide that the Fourth Amendment even applied to the issues presented. Moreover, the court did not determine that police officers had a lower expectation of privacy than other individuals; rather, it determined only that the intrusion was not unreasonable in the circumstances presented.

*Broderick* also concerned questionnaires directed to Boston police officers. As in *O'Brien,* the primary issue presented was not one under the Fourth Amendment. Indeed, the *Broderick* court never even refers to the Fourth Amendment in its opinion.

The cases cited by defendant fail to support the proposition that Boston police officers have a substantially lower expectation of privacy than other individuals in relation to random urine testing. Both cases involve questionnaires in circumstances where it is clear that neither court believed a search and seizure was present. *Cf. supra* at pages 958–59. *O'Brien* and *Broderick* establish only that the city has a legitimate interest in the integrity of its police force, which interest is rationally served by inquiry into certain aspects of an officer's off-duty conduct. They do not speak to the balancing required under the Fourth Amendment.

## VI.

For the foregoing reasons, I conclude that the invasion of the police officers' expectation of privacy resulting from the enforcement of the random testing provision in Rule 111 outweighs the city's need to conduct random drug searches; therefore, the method of testing provided for in section 3(b) of Rule 111, on its face, authorizes an unreasonable search and seizure and violates the Fourth Amendment.

█ In addition to the declaratory relief to which I have determined plaintiff is entitled, plaintiff has requested permanent injunctive relief. I conclude, however, that on the record before me there is no basis for finding any likelihood that the defendant, as a responsible public official, would attempt to proceed with enforcement of section 3(b) of Rule 111 while a court judgment remains in effect, determining that provision to be in violation of the Fourth Amendment. In these circumstances, I cannot find a likelihood that plaintiff will suffer irreparable harm in the absence of an injunction. For this reason, the final judgment entered at this time will not include injunctive relief. Of course, plaintiff will be free to move that the case be reopened for further proceedings upon a showing that a need has arisen for additional relief.

## FINAL JUDGMENT

Section 3(b) of Boston Police Department Rule No. 111, providing for "universal random urinalysis," violates the Fourth and

Fourteenth Amendments of the United States Constitution.