Robert T. **GUINEY, individually and as he is President and Representative of the Boston Police Patrolmen's Association, Inc., Plaintiff,**

v.

**Francis M. ROACHE, as he is Police Commissioner of the City of Boston, Defendant.**

Civ. A. No. 86–1346–K.

United States District Court,
D. Massachusetts.

March 6, 1987.

Frank J. McGee, McGee & Phillips, Marshfield, Mass., for plaintiff.

Michael Powers, James F. Hart, Boston Police Hdqtrs., Joseph I. Mulligan, Law Dept., City Hall, Boston, Mass., for defendant.

Mass Civil Liberties Union, Marjorie Heins, John Reinstein, Boston, Mass., for amicus curiae.

Robert J. Cynkar, Deputy Asst. Atty. Gen.; Richard Greenberg, Mary Goetten, Brian G. Kennedy, Dept. of Justice, Washington, D.C., for amicus curiae.

Opinion

KEETON, District Judge.

This is an action challenging Boston Police Department Rule 111, which authorizes urinalysis drug testing of department employees on both a reasonable suspicion and a random basis. Plaintiff seeks (1) a declaratory judgment that the Rule's random testing provision violates the Fourth and Fourteenth Amendments, and (2) equitable relief temporarily and permanently enjoining its enforcement. By consent of the defendant, the action has proceeded as a class action on behalf of all Boston police officers below the rank of sergeant. With the consent of both parties, the court, in order to expedite the case, bypassed hearings on plaintiff's prayer for preliminary injunction and on potentially dispositive defense motions, and proceeded directly to non-jury trial of the entire case.

Trial commenced on October 1, 1986, and on that same day the evidence was closed subject to supplementation pursuant to an agreement of the parties approved by the court. Thereafter plaintiff moved to reopen the evidence, and because of a lack of clarity with respect to the intent and effect of this motion and other submissions filed after October 1, the court convened a fur-

ther conference on December 15, 1986, at which time a further stipulation was filed and the evidence was closed.

In addition to oral arguments of counsel and amici curiae, briefs have been filed by the parties and by Deputy Assistant Attorney General Robert J. Cynkar, Richard Greenberg, Mary Goetten, and Brian G. Kennedy of the Department of Justice, Civil Division, and by Attorneys Marjorie Heins and John Reinstein on behalf of the Massachusetts Civil Liberties Union, as amici curiae.

## I.

The evidence before the court consists principally of a stipulation, as amended in open court on October 1, 1986 and in conference on December 15, 1986, by which the parties agreed to the following:

(1) The Plaintiff, Robert T. Guiney, is President and a member of the Boston Patrolmen's Association, Inc., a labor organization incorporated under the laws of Massachusetts consisting of approximately fifteen hundred (1500) Boston police patrolmen.

(2) The Defendant, Francis M. Roache, is Police Commissioner of the City of Boston.

(3) The rule which is at issue in this litigation, Boston Police Department Rule 111, was issued by the defendant in his capacity as Police Commissioner of the City of Boston on April 24, 1986, to be effective June 21, 1986, but not to be enforced by mutual agreement of the parties pending the ruling by this court.

(4) By issuing Rule 111, the defendant has adopted a rule and policy requiring Boston Police Officers to submit to urine testing for illegal drug use both on a reasonable suspicion basis and on a random, without cause, basis.

(5) Pursuant to such rule and policy, if a police officer refuses to take such test, he (or she) shall be subjected to disciplinary action, including suspension and/or discharge.

(6) Further, pursuant to such rule and policy, if a police officer's urine test is interpreted as "positive" (suggesting the existence of illegal substances within such police officer's bodily system), such police officer shall be subject to disciplinary action, including suspension and/or discharge.

(7) Moreover, pursuant to such rule and policy, the secondary confirmation test of any positive finding of any selected drug or drugs (except cannabinoids) resulting from the initial screening test performed on such urine samples, shall be accomplished by gas chromatography/mass spectrometry as described in Special Order 86–70 amending Rule 111 attached hereto and marked as "Exhibit A" which is hereby incorporated and made a part of this stipulation between the parties.

(8) Under such rule and policy the individual police officers selected to be tested by the Department will perform their bodily functions in private and unobserved as described in Special Order 86–70 amending Rule 111 attached hereto and marked as "Exhibit A" which is hereby incorporated and made a part of this stipulation between the parties.

Boston Police Department Rule No. 111, Drug Testing for Departmental Personnel, was adopted April 24, 1986. Rule 111 was amended twice in October 1986, first by Special Order 86–67, which was revoked, and then by Special Order 86–70. The parties stipulated on December 15, 1986 that as amended by Special Order 86–70, Rule 111 is as set out below. The phrase in Section 9 and the paragraph in Section 12 that were deleted by amendment are bracketed and the sentences in Sections 9, 10, and 12 that were added by amendment are underlined.

Sec. 1 This rule is issued to establish uniform internal policy and procedures to govern the administration of a screening process to test and control unauthorized use of illicit drugs among all sworn and civilian personnel of the Boston Police Department. The De-

partment is seeking to test for drugs which have a high potential for abuse, have no medical use in treatment, and for which there is no safe protocol for medical use.

Sec. 2   This Rule is written and promulgated to be used in conjunction with Rule 102 governing the general conduct, duties and responsibilities of the Boston Police Department personnel. It takes cognizance of the rights inherent in each individual of the Department under the Constitution of the United States of America and the Commonwealth of Massachusetts.

It is established to help combat the national epidemic in the illicit use of drugs and to combat illegal trafficking in drugs.   It is adopted to rationally foster the efficient operation of the Boston Police Department and to establish a reasonable and uniform system by which the Department can monitor its employees for unauthorized drug use.

The Rule is necessary to preserve and protect the integrity of the Department and its personnel;   to guard against the harmful consequences to the public good occasioned by the unauthorized unlawful use of, or the illegal trafficking in, illicit drugs by law enforcement personnel and to preserve and maintain a high degree of public confidence in all those charged with upholding public order and public safety.

Sec. 3   The Department hereby establishes two base methods of implementing this Rule to identify Department personnel who are users of certain controlled substances:

a.   Testing of those individual subjects where facts are sufficient to constitute reasonable suspicion of controlled substance abuse as further described in Section 4; and

b.   A universal random urinalysis procedure.

Sec. 4   In circumstances where the facts are sufficient to constitute a reasonable suspicion that a Department employee is a user of certain controlled substances, the Department shall have the right to require that employee to submit without delay to a urinalysis test.

Reasonable suspicion shall be based on information of objective facts obtained by the Department and the rational inferences which may be drawn from those facts.

The credibility of the sources of information whether by tip or informant, the reliability of the facts of information, the degree of corroboration, the results of Department inquiry and/or other factors shall be weighed in determining the presence or absence of reasonable suspicion.

Sec. 5   There shall be a Drug-Testing Advisory Committee, members to be appointed by the Commissioner, which shall meet from time-to-time to advise the Commissioner on procedural and technical matters pertinent to the drug-testing program established by this Rule.

The members of the Committee shall include a representative of each of the official collective bargaining groups representing members of the Department; three or more medical specialists qualified in the various sciences pertinent to the conduct of drug-testing such as pharmacology, toxicology and pathology; and such other members as the Commissioner deems appropriate.

The Committee shall offer recommendations to the Commissioner on the procedures and mechanics of conducting a drug-testing program and on the science of drug-testing with a view to maintaining fairness, objectivity, accuracy and confidentiality in the entire drug-testing program.   Also, the Committee shall make recommendations on the following:

a.   Changes and improvements in science and technology which will improve the effectiveness of laboratory

testing for the detection of drug abuse among Department personnel.

b. Appropriate external proficiency-testing and internal quality assurance procedures for evaluating the performance of drug-testing laboratories.

c. Procedures for the certification, decertification, and recertification of laboratories for drug analyses.

d. Make recommendations to improve the effectiveness of the drug-testing program.

Sec. 6 The employee-subject to be drug-tested will be selected by randomized independent computer process unless otherwise to be tested on [a] reasonable suspicion basis. The subject will be notified of the test requirement just prior to transport to the medical facility or laboratory designated by the Department to obtain the urine sample. At the time of the test the subject will be notified of the specific drugs which will be screened by the test. The subject will be accompanied by a Testing Officer from the Department assigned to supervise the taking of the urine sample and responsible for proper conduct and uniform procedures of urine sampling process.

The subject will be assigned a test code-identification for purposes of maintaining anonymity and to assure privacy throughout the sampling and testing procedure. At the sampling site the subject will be required to deposit a sample of urine into an approved container up to a required-minimum quantity necessary for laboratory testing purposes. The subject will be required to thoroughly wash hands and fingernails prior to urination and shall be required to sign and certify Department documentation that the coded identification on the sample container corresponds with test code-identification assigned to him/her. From the point of embarking and at all stages of the urine-sampling procedure the subject will be under the direct supervision of the Testing Officer and is expected to follow strictly each in-struction of the Testing Officer. Following the completion of the urine-sampling procedure, the subject will then be re-transported to his/her original point of departure.

Sec. 7 Testing Officers shall be appointed or assigned by the Commissioner from the Department with full authority to order personnel compliance to oversee the integrity of the Department's role in the personnel drug-screening process. They shall be responsible for the notification of the subject-employee of his/her random selection for testing and of the specific drugs for the detection of which, the test will be administered.

The Testing Officer shall be responsible for the attendance, identification and transportation of personnel to-be-screened to the designated test site at the appointed time and shall certify as to the cleanliness of the surroundings, the sterility of the sample and the integrity of the entire sampling procedures.

The Testing Officer shall supervise and observe in the company of the medical officer or technician all aspects of obtaining, marking and packaging of individual urine samples including the following:

(A) To assure that the medical officer or technician is afforded the cooperation of the subject in securing the urine sample from the subject in the necessary amount into the test container. Also, to oversee the securing and sealing of the individual urine sample containers of each subject-employee; and

(B) The accurate matching of coded-identification of the subject with the sample and the containers including the seals and any packaging of the sample containers; and

(C) The exact completion and execution of the required legal documentation of chain-of-custody including appropriate identification and certification of [the] medical or technical offi-

cer participating in obtaining the urine sample from the test subject and by bonded courier if so employed; and (D) The proper maintenance of anonymity of the subject with the medical or technical officer conducting the urine-sampling procedure; and

(E) If necessary, to arrange for transport of the specimen by designated bonded courier to the testing laboratory if located elsewhere; and

(F) To arrange for the return transportation of the subject; and

(G) All other steps necessary for the purpose of maintaining absolute control and legal accountability from initial notification of the subject to the final marking, sealing, packaging and transport arrangements for the urine samples to the testing laboratory together with the accompanying chain-of-custody documents, and the strict maintenance and final delivery of accurate Department ledgers and documents relating to the test, chain-of-custody and test records to the Commissioner or that person authorized by him to receive them; and

(H) To strictly apply all other more-detailed testing procedures as may be required by the Department prior to the effective date of actual testing. Testing Officers shall attend an initial training seminar in the proper and legal administration of this personnel drug-testing rule prior to the start of actual testing and such other additional training seminars as changes and modifications in the program or procedures may require.

Sec. 8 *PERSONNEL SELECTION FOR RANDOM SCREENING*

The selective procedure will be governed by a secured computer selection process. The selection of individual personnel to-be-screened will be effected by a computer program designed for random selection. Human intervention in this process is limited to the programming of the computer by an independent contractor hired outside the Department for the purpose according to contract specifications.

Sec. 9 Urine samples will be taken at a medical or laboratory site selected by the Department for this purpose. This facility may or may not be affiliated with the testing laboratory or facility which will be conducting the urinalysis process.

This facility must provide a clean and sanitary location for the urine-sampling process including washing facilities. It must also provide a competent person qualified in the practice of sterile urine-sampling and experienced in the legal requirements of chain-of-custody documentation and procedures. The person will be required to work cooperatively with the Testing Officer in obtaining from selected individuals under his/her direction [and in his/her presence] urine samples in the required quantity, in proper receptacles for purposes of laboratory urinalysis for controlled substances, and to arrange for marking, sealing, packaging, storing and final delivery of such specimens to the testing laboratory.

*All personnel selected to submit a sample for urinalysis shall be provided a private sanitary area at the collection center. The individual will be in a hospital-type gown and will not have access to street clothes, purses, bags, etc. After providing the sample, the subject will call the testing officer or medical assistant. In the presence of the individual, the medical assistant will pour the sample into the plastic laboratory bottle, cap the bottle and place the tamper proof seal over the cap.*

Sec. 10 Testing process of urine specimens of personnel shall be completed by a qualified medical laboratory selected by the Department which shall meet Department contract specifications which will ensure results are legally supportable and scientifically accurate.

With the delivery of each specimen, the Department will designate to the

testing laboratory only certain specific drugs for which the specimen is to be analyzed. The testing laboratory will report findings only as to those specific substances contained in the Department request.

To ensure optimum accuracy the tests shall be drug-specific. The drug-abuse screening test will consist of two tests:

a. The initial test of each urine sample shall employ a methodology different from the secondary confirmation test.

b. The initial test shall use a thin-layer chromatography process unless a different process has been approved by the Department. The test process at the laboratory for the initial analysis will be completed in 24–48 hours.

c. The secondary confirmation test of any positive findings of specific drugs selected to be screened in the subject shall be accomplished by one of the following methods: enzyme immunoassay, gas liquid chromatography, mass spectrometry.

d. The test procedure for determining the presence of cannabinoids will be immunoassay. Secondary confirmation test of a positive finding for the presence of cannabinoids will be gas chromatography-mass spectrometry.

e. The foregoing drug-testing procedures are not meant to be an exhaustive compilation of the tests that will be or could be used to implement the personnel drug-screening program.

f. The testing laboratory will make provision to properly preserve, store and secure one aliquot of the original urine specimen to be reserved and made available for purposes of independent confirmation testing by experts chosen and authorized by the subject-employee. This employee-confirmation test will be conducted at the testing laboratory jointly with the experts representing the subject-employee and the laboratory chemists and experts of the testing laboratories which returned the original urine-test findings. Also, the testing laboratory will make available to the inspection of the employee or his representative all records of primary and secondary confirmation testing done by the testing laboratory on the urine specimen provided by the employee.

g. *The confirmatory test will be a test different from the initial test. The test will be a gas liquid chromatography, mass spectrometry (GC/MS).*

Sec. 11 The testing laboratory contracted by the Department to test urine specimens under this Rule must continue the uninterrupted chain-of-custody procedure from receipt of specimens and to maintain internal chain-of-custody procedures which establish fundamental accountability and reliability of testing from a legal viewpoint at each stage in the handling, testing, and storing of specimens and reporting of test results.

The testing laboratory will be subjected to appropriate external proficiency-testing and internal quality-assurance procedures for evaluating the performance of its testing process and procedures and for strict conformity with the contract specifications. The testing laboratory will not be allowed to know the identity of the subject tested. Strict confidentiality must be maintained throughout the entire testing and reporting process. Results of the test will be sealed and forwarded only to the Commissioner or that person authorized by the Commissioner to receive test results.

Sec. 12 [All personnel whose confirmatory test results in a positive finding for controlled substances, will be subject to the full range of discipline including discharge from the Department pursuant to M.G.L. Chapter 31, Sections 41–46 and Rule 109.]

*Final scientific confirmation of the presence of one of the four harmful drugs (defined in the last sentence of Rule 111, section 1) in the urine sample of an employee shall set in mo-*

*tion the operation of Mass. General Laws Chapter 31, sections 41–46. These sections provide and protect the legal rights of tenured Civil Service employees. Under these provisions the employee is entitled to a full department hearing and a subsequent 'de novo' Civil Service hearing at which hearings he/she is afforded the opportunity to present a complete legal defense and exculpatory evidence and to contest all scientific and other evidence presented by the Department pursuant to the complaints. The employee shall be charged under the general complaint of conduct unbecoming an employee (Rule 102, section 3) and the unauthorized use of illegal drugs (Rule 102, section 16) under Boston Police Rules and Regulations. The Department shall bear the burden of proving the presence of illegal drugs in the urine sample; and that the employee knowingly violated Regulations 102, sections 3 and 16.*

*A finding against the employee shall subject him/her to a full range of discipline under the Rules and Regulations of the Boston Police Department.*

*A finding for the employee shall constitute an exoneration of the employee.*

Sec. 13   The provisions of this regulation are severable and if any of its provisions shall be held unconstitutional or otherwise invalid by any court of competent jurisdiction, the decision of such court shall not affect or impair any of the remaining provisions.

Francis M. Roache
Police Commissioner

The first sentence of Section 12, added by Special Order 86–70, refers to "the four harmful drugs (defined in the last sentence of Rule 111, Section 1)." No such definition appears at the cited place, and I have not found any other reference to "four harmful drugs" in Rule 111. No contention of either party refers to this discordant reference, and the evidence fails to explain it, unless the answer is supplied by the reference in Section 16 of Rule 102 to "prescription drugs, controlled substances, narcotics or hallucinogens except when prescribed...." I conclude that, in any event, the resulting ambiguity has no bearing on disposition of issues now before the court.

The amendment of Section 9 of Rule 111 was aimed at protecting privacy, and it is undisputed that it rendered moot those arguments previously advanced on grounds of invasion of privacy because of requirements (which appeared in the rule before amendment) that the police officer be observed during urination.

The amendment of Section 10 added the final two sentences of that section, requiring that the confirmatory test be a different test and be a gas liquid chromatography, mass spectrometry (GC/MS).

The amendment of Section 12 was apparently intended to address concerns raised by the court during oral argument with respect to the possibility that the original Rule 111 would subject even an innocent ingestor of a controlled substance (for example, someone who had been "set up" or drugged against his or her will) to "the full range of discipline including discharge." Unlike the original Section 12, under which discipline might have been imposed solely upon a positive finding for controlled substances, the amended Section 12 appears to place a burden on the Police Department to prove that the employee knowingly violated Rule 102—either Section 3 (conduct unbecoming an employee) or Section 16 (unauthorized use of illegal drugs), or both.

II.

The parties and amici curiae have vigorously argued an extensive range of important and debatable constitutional issues, focusing on Rule 111's validity under the Fourth and Fourteenth Amendments, that they urge the court to address. I conclude, however, for reasons stated below, that as a matter of sound discretion I should abstain from deciding these constitutional issues at this time.

■ Under the doctrine referred to as *Pullman* abstention, derived from *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), a federal court should ordinarily decline to rule on a constitutional challenge to state action when the case presents unsettled questions of state law which are potentially dispositive. *See* 17 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4242 (1978). As the doctrine has been developed by the Supreme Court, *Pullman* abstention is appropriate where the state law at issue is unclear and subject to an interpretation that would avoid or modify the federal constitutional issues. *See, e.g., Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972). As explained in *Pullman*, this type of abstention both allows federal courts to avoid "the friction of a premature constitutional adjudication" and shows a "scrupulous regard for the rightful independence of the state governments[.]" *Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. at 500–01, 61 S.Ct. at 645 (citation omitted).

In *Pullman*, the state action at issue was an order of the Texas Railroad Commission requiring the presence of Pullman conductors (who were all white) as opposed to Pullman porters (who were all black) in all railroad sleeping cars. The Pullman Company and the railroads, joined by Pullman porters who were permitted to intervene, challenged the order as a violation of the Equal Protection, the Due Process, and the Commerce Clauses of the United States Constitution, and as unauthorized by Texas law. The Court held that the district court should have abstained from deciding the federal constitutional issue in order to allow for a definitive ruling on the state law issue by the state courts. Writing for the Court, Justice Frankfurter explained that a decision on the "more than substantial" constitutional issue presented by the Fourteenth Amendment claims of the Pullman porters should be avoided if the state issue was dispositive:

> [The constitutional issue] touches a sensitive area of social policy upon which the

federal courts ought not to enter unless no alternative to its adjudication is open. Such constitutional adjudication plainly can be avoided if a definitive ruling on the state issue would terminate the controversy.

*Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. at 498, 61 S.Ct. at 644.

For the reasons stated below, I conclude that the present case is so closely analogous to *Pullman* that abstention is appropriate.

### III.

At oral argument, which occurred before the amendment of Section 12 of Rule 111, the court inquired of counsel for defendant by what means the court could ascertain the consequences that would or might follow a "positive" result of a screening test administered under Rule 111, and by what substantive and procedural standards these consequences would be determined. As was observed at that time, if the substantive definition of "just cause" is merely a positive test result, the person tested would be subject to arbitrary discipline. He or she could not defend against disciplinary action, for example, by proving that the test result came about because the police officer had been "set up" or drugged against his or her will and without knowledge that he or she was ingesting a controlled substance. For this reason, a substantive standard concerned merely with test result would present very different issues of validity of the Rule, both under state law and under federal constitutional law, from the issues that would be presented if the substantive standard required, as a prerequisite to discipline, the knowing ingestion of a controlled substance.

After oral argument, Section 12 of Rule 111 was amended in an apparent attempt to specify the procedural and substantive standards governing disciplinary proceedings based on violations of the Rule. The amended Section 12 reads as follows:

> Final scientific confirmation of the presence of one of the four harmful drugs

(defined in the last sentence of Rule 111, section 1) in the urine sample of an employee shall set in motion the operation of Mass.General Laws Chapter 31, sections 41–46. These sections provide and protect the legal rights of tenured Civil Service employees. Under these provisions the employee is entitled to a full department hearing and a subsequent 'de novo' Civil Service hearing at which hearings he/she is afforded the opportunity to present a complete legal defense and exculpatory evidence and to contest all scientific and other evidence presented by the Department pursuant to the complaints. The employee shall be charged under the general complaint of conduct unbecoming an employee (Rule 102, section 3) and the unauthorized use of illegal drugs (Rule 102, section 16) under Boston Police Rules and Regulations. The Department shall bear the burden of proving the presence of illegal drugs in the urine sample; and that the employee knowingly violated Regulations 102, sections 3 and 16.

A finding against the employee shall subject him/her to a full range of discipline under the Rules and Regulations of the Boston Police Department.

A finding for the employee shall constitute an exoneration of the employee.

The provisions of the Massachusetts civil service laws to which Section 12 of Rule 111 refers concern hearings, judicial review, seniority rights, civil actions, reimbursement of expenses, and reinstatement of tenured civil service employees who are subjected to discipline, including Boston Police Department personnel. *See* Mass. Gen.L. ch. 31, §§ 41–46 (1984); *see also* Mass.Gen.L. ch. 31, § 51 (1984). They do nothing to clarify substantive standards for susceptibility to discipline.

Section 41 of Chapter 31 declares:

Except for just cause and except in accordance with the provisions of this paragraph, a tenured employee shall not be discharged, removed, suspended for a period of more than five days, laid off, transferred from his position without his

written consent if he has served as a tenured employee since prior to October fourteen, nineteen hundred and sixty-eight, lowered in rank or compensation without his written consent, nor his position be abolished....

Mass.Gen.L. ch. 31, § 41 (1984). When an appointing authority undertakes to impose any of the foregoing forms of discipline "for just cause," it is required to provide a written notice,

which shall include the action contemplated, the specific reason or reasons for such action and a copy of sections forty-one through forty-five, and shall be given a full hearing concerning such reason or reasons....

*Id.* Also, the appointing authority shall "provide such employee a written notice of the time and place of such hearing...." *Id.* The statute also provides that the lesser discipline of suspension for just cause for a period of five days or less may be imposed "without a hearing prior to such suspension." *Id.* However,

[s]uch suspension may be imposed only by the appointing authority or by a subordinate to whom the appointing authority has delegated authority to impose such suspensions, or by a chief of police or officer performing similar duties regardless of title, or by a subordinate to whom such chief or officer has delegated such authority. Within twenty-four hours after imposing a suspension under this paragraph, the person authorized to impose the suspension shall provide the person suspended with a copy of sections forty-one through forty-five and with a written notice stating the specific reason or reasons for the suspension and informing him that he may, within forty-eight hours after the receipt of such notice, file a written request for a hearing before the appointing authority on the question of whether there was just cause for the suspension.

*Id.*

It may be that this statute does not protect a tenured employee against any other form of discipline than those forms it re-

fers to and, by implication perhaps, any other form of discipline of like or greater severity. Perhaps additional protection is afforded by other statutes. *E.g.*, Mass. Gen.L. ch. 31, § 62 (1984) (regulating punishment duty of police officers). Yet, the statutes as a whole may not regulate all possible forms of discipline. If they do not, a court must look elsewhere for guidance as to substantive standards applicable to a particular form of discipline.

In addition to referring to these civil service statutes, Section 12 of Rule 111 refers to Sections 3 and 16 of Rule 102, governing the conduct, general rights, and responsibilities of Boston Police Department Personnel. Section 3 of Rule 102 states:

> CONDUCT: Employees shall conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorably on the Department. Conduct unbecoming an employee shall include that which tends to indicate that the employee is unable or unfit to continue as a member of the Department, or tends to impair the operation of the Department or its employees.

Section 16 of Rule 102 states:

> USE OF DRUGS: Employees shall not use any prescription drugs, controlled substances, narcotics or hallucinogens except when prescribed in the treatment of the employee by a registered physician or dentist. When prescription drugs, controlled substances, narcotics or hallucinogens are prescribed for him, an employee shall notify his superior officer or supervisor, in writing, before his next tour of duty of such prescription. Prescription drugs, controlled substances, narcotic or hallucinogenic shall mean any substances so defined in Massachusetts General Laws, Chapter 94C.

> A superior officer [or] supervisor shall, when notified by an employee that any prescription drugs, controlled substances, narcotics or hallucinogens have been prescribed and ingested, notify the Department physician of the quantity of the substance which the employee reports has been prescribed and shall be guided by the Department physician's opinion as to whether or not the employee can fulfill his duties while under the influence of such prescribed substance. In the event that the Department physician cannot be reached, the superior officer or supervisor shall exercise his own best judgment as to whether or not the employee, reporting the use of such substance, should perform his Departmental duties. Whether or not the employee does continue to perform his Department duties shall not affect the responsibility of the superior officer or supervisor to notify the Department physician of the use of such substance as soon as possible.

Although Section 2 of Rule 111 states that Rule 111 "is written and promulgated to be used in conjunction with Rule 102," only Sections 3 and 16 of Rule 102, which are specifically mentioned in Section 12 of Rule 111, potentially contain a substantive standard as to what constitutes a cause, or a "just cause," for discipline following a positive result in a drug screening test.

Unlike the original version of Section 12, the amended Rule specifies that the employee will be charged with violating Sections 3 and 16 of Rule 102 and places a burden on the Department to prove that the employee "knowingly violated" those provisions. Thus, the amended Section 12 appears to create a substantive standard of knowing violation of conduct unbecoming an employee or unauthorized use of drugs. This may satisfy concerns about the unavailability (before the amendment) of a defense such as being "set up" or even of passively ingesting fumes or smoke in a room. I note, however, that ambiguities in the substantive standard may remain. For example, the parties' stipulation states that pursuant to Rule 111,

> if a police officer's urine test is interpreted as "positive" (suggesting the existence of illegal substances within such police officer's bodily system), such police officer shall be subject to disciplinary action, including suspension and/or discharge.

Stipulated Agreement of Facts Between the Parties at para. 6 (as amended December 15, 1986). This suggests that the parties themselves interpret Rule 111 as subjecting an officer to disciplinary action upon a positive test result alone. However, I need not decide whether a state court decision on a challenge to Rule 111 on these grounds, or on any other grounds of state statutory or decisional law, might modify or avoid the constitutional issues that have been argued here, because I conclude (for reasons stated below) that substantial issues of state constitutional law exist which make abstention appropriate in this case.

## IV.

A potentially dispositive state law ground for decision is whether Rule 111 violates Article XIV of the Declaration of Rights of the Massachusetts Constitution, which declares:

> Every subject has a right to be secure from all unreasonable searches, and seizures, of his person, his houses, his papers, and all his possessions. All warrants, therefore, are contrary to this right, if the cause or foundation of them be not previously supported by oath or affirmation; and if the order in the warrant to a civil officer, to make search in suspected places, or to arrest one or more suspected persons, or to seize their property, be not accompanied with a special designation of the persons or objects of search, arrest, or seizure: and no warrant ought to be issued but in cases, and with the formalities prescribed by the laws.

Mass. Const. pt. 1, art. 14.

█ The Supreme Court has held that *Pullman* abstention may be appropriate in at least some circumstances in which the unsettled question of state law involves an evaluation of the validity of a challenged statute under the state constitution. *See, e.g., City of Meridian v. Southern Bell Tel. & Tel. Co.*, 358 U.S. 639, 79 S.Ct. 455, 3 L.Ed.2d 562 (1959). Abstention to allow state courts to evaluate a statute under a state constitutional provision may be most appropriate where the state provision is substantively different from the federal provision at issue. *See Reetz v. Bozanich*, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970) (state constitutional provisions concerning fish resources). Conversely, the Court has held that abstention is not required where the provision of the state constitution to be interpreted parallels a provision of the United States Constitution. *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 237 n. 4, 104 S.Ct. 2321, 2327 n. 4, 81 L.Ed.2d 186 (1984). Allowing state courts to interpret unclear statutes (and unclear rules or ordinances of local authorities) in light of the unique provisions of the state's own constitution serves the federalism concerns that underlie *Pullman* abstention and also ensures that federal courts do not render unnecessary decisions concerning the federal constitution. On the other hand, where the state constitutional provision is modeled on or substantively identical to a federal constitutional provision, there are no uniquely state interests at stake, and the policies underlying *Pullman* abstention would not be served by abstaining in order to allow a state court to interpret the statute, ordinance, or rule in light of the state constitution. *See* 17 C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 4242, at 462–64 (1978); Field, *Abstention in Constitutional Cases: The Scope of the* Pullman *Abstention Doctrine*, 122 U.Pa.L.Rev. 1071, 1099 n. 108 (1974).

Although the search and seizure provision of the Massachusetts Constitution is substantively similar to the Fourth Amendment of the United States Constitution, Article 14 of the Declaration of Rights, which was adopted in 1780, was clearly not modeled on the Fourth Amendment, since the Bill of Rights was not proposed in Congress until 1789 and was not ratified until 1791. Indeed, some scholars believe that the Fourth Amendment was modeled on Article 14 of the Declaration of Rights. *See* J. Landynski, *Search and Seizure and the Supreme Court* 38 (1966); *see also Harris v. United States*, 331 U.S. 145, 158,

67 S.Ct. 1098, 1105, 91 L.Ed. 1399 (1947) (Frankfurter, J., dissenting).

Furthermore, it is clear that the Massachusetts Supreme Judicial Court does not interpret Article 14 as if it were merely a counterpart to the Fourth Amendment but instead interprets it as offering protections beyond those established by the Fourth Amendment. In *Commonwealth v. Upton*, 394 Mass. 363, 476 N.E.2d 548 (1985), the Supreme Judicial Court held that the test for determining probable cause is stricter under Article 14 of the Declaration of Rights than under the Fourth Amendment. In an earlier decision in the same case, the Supreme Judicial Court had evaluated the existence of probable cause to issue a search warrant under the "totality of the circumstances" test announced in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), and concluded that the search at issue was unreasonable under the Fourth Amendment. *Commonwealth v. Upton*, 390 Mass. 562, 458 N.E.2d 717 (1983). On appeal of this decision, the United States Supreme Court rejected the Supreme Judicial Court's interpretation of *Gates* and held that there was probable cause within the meaning of the Fourth Amendment to issue the search warrant. *Massachusetts v. Upton*, 466 U.S. 727, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984). On remand, the Supreme Judicial Court concluded that Article 14 "provides more substantive protection to criminal defendants than does the Fourth Amendment in the determination of probable cause" and held that the search was unreasonable under the Massachusetts Constitution. *Commonwealth v. Upton*, 394 Mass. at 373, 476 N.E.2d at 556. Thus, the Commonwealth's highest court has explicitly interpreted Article 14 to be independent of the Fourth Amendment and to provide greater substantive protection than the Fourth Amendment, at least with respect to determining the existence of probable cause.

█ Because Article 14 is not simply a counterpart to the Fourth Amendment but has been interpreted to be independent from it, the question of Rule 111's constitutionality will present different issues under the Massachusetts Constitution than under the United States Constitution. The Massachusetts Supreme Judicial Court's interpretation of Article 14 creates a real possibility that Rule 111 could be held to violate Article 14 regardless of whether or not it violates the Fourth and Fourteenth Amendments. Thus, an evaluation of Rule 111's validity under Article 14 could obviate the need to consider its validity under the Fourth and Fourteenth Amendments and could therefore allow this court to avoid rendering an unnecessary constitutional ruling.

I conclude that the issue of whether Rule 111 violates Article 14 should be resolved before the federal constitutional issue is reached, and preferably should be resolved by the state courts rather than this court. As the Supreme Court held in *Pullman*, where the state law issue is unclear, a federal court's decision on the state law "cannot escape being a forecast rather than a determination." *Texas Railroad Comm'n v. Pullman Co.*, supra, 312 U.S. at 499, 61 S.Ct. at 645. So long as the parties have the means to "secur[e] a definitive ruling in the state courts ... with full protection of the constitutional claim, the district court should exercise its wise discretion by staying its hands." *Id.* at 501, 61 S.Ct. at 645.

The federalism concerns which support leaving to state courts decisions of the validity of state laws under a state constitution are arguably more limited in this case than in *Pullman* because the "legislative" action challenged here is that of the Boston Police Commissioner, rather than a state legislature, and the enforcement at issue is that of a municipal police department rather than that of a state agency. Nevertheless, as observed in Part III, *supra*, Boston police personnel are subject to the statewide civil service laws, including the statutory requirement that tenured employees not be discharged or subjected to certain forms of discipline without a hearing to determine the existence of just

cause. *See* Mass.Gen.L. ch. 31, §§ 41–46 (1984). Because the civil service statutes and disciplinary procedures apply to Boston Police Department employees (as well as many other city and municipal employees), and state agencies are implicated in administrative procedures that may be invoked, a challenge to Rule 111 necessarily implicates state polices and state agencies.

## V.

■ An additional factor supporting abstention in this case involves the nature of the factual disputes before the court. In order to sustain Rule 111 against a Fourth and Fourteenth Amendment challenge, the defendant must show a compelling need outweighing the Fourth and Fourteenth Amendment interests that are sacrificed by any rule that subjects all police personnel to either regular or random testing for traces of controlled substances in their urine. This burden might arguably be satisfied either (1) by evidence offered in the case sub judice that supports a fact finding that such a compelling need exists because of circumstances distinctive to the Commonwealth of Massachusetts or the Boston Police Department, or (2) by a showing that such a compelling need exists in police departments generally throughout the United States because of facts common to such departments generally.

■ A showing of the first type, which would present to the court an adjudicative fact issue distinctive to this case, has not been seriously attempted in this case. Although compelling need has been argued in the written briefs submitted by the defendant and by the Department of Justice amici, no evidence was proffered at trial to support an adjudicative fact finding of such need. The only evidence in the record that could even tend to support such a fact finding is the statement in the affidavit of Deputy Superintendent Arthur Morgan that, "[i]n 1985 there were 3 police officers discharged for misconduct directly related to involvement with illicit controlled substances.... [I]n 1970 through 1983 there were no terminations for that reason." Af-

fidavit of Arthur Morgan at para. 1 (as amended October 3, 1986). This evidence is plainly insufficient to support an adjudicative fact finding that circumstances distinctive to the Boston Police Department have created a compelling need that outweighs the Fourth and Fourteenth Amendment interests of the department employees who are subject to drug testing under Rule 111. *Cf. Penny v. Kennedy*, 648 F.Supp. 815, 816 (E.D.Tenn.1986) (evidence consisting of two police officers having tested positive in 1985 urine tests, police chief's statement that 90% of department had no drug problem, officer's statement and "rumors" that there had been switched samples in 1985 test, tip from FBI that an officer had been in contact with a drug dealer, and pre–1985 statement from officer who admittedly used marijuana that "several officers used marijuana," did not justify mass drug testing of officers without reasonable suspicion); *Lovvorn v. City of Chattanooga, Tenn.*, 647 F.Supp. 875, 882 (E.D.Tenn. 1986) (evidence that several fire fighters tested positive and "some" switched samples in 1985 tests, without "objective facts concerning deficient job performance or physical or mental deficiencies on the part of [the city's] fire fighters, either in general or with respect to specific personnel" did not support finding of an increased incidence of drug abuse in the department that posed a threat to its readiness or efficiency); *National Treasury Employees v. von Raab*, 649 F.Supp. 380, 390 (E.D.La.1986) (record with "conspicuous absence of any statistics ... showing any drug problem whatsoever among federal workers" could not justify drug testing of customs officials without reasonable suspicion), *stay pending appeal denied*, 808 F.2d 1057 (5th Cir. 1987); *American Fed'n of Gov't Employees, AFL–CIO v. Weinberger*, 651 F.Supp. 726 (S.D.Ga.1986) (record with "no evidence whatsoever" that drug problem existed among civilian police officers whom Army sought to have tested would not justify testing without reasonable suspicion); *Caruso v. Ward*, 133 Misc.2d 544, 506 N.Y. S.2d 789 (N.Y.Sup.Ct.1986) (evidence that 22 police officers tested positive for drug

use in force of over 26,000 could not support finding that drug use was more than "a very occasional problem at best"). Moreover, the factual premises for the adoption of Rule 111, recited in the text of the Rule itself (*see* Section 2 of the Rule, quoted in Part I above) are focused on an asserted "national epidemic in the illicit use of drugs" rather than the particular circumstances existing in the Boston Police Department.

The defense argument rests, then, on an assertion that this court should determine the existence of a national need (or at least should determine that the recited factual premise of a national need is supportable as a fact finding by the Boston Police Commissioner) without receiving evidence on the subject. Such a determination is appropriate only if this or a higher court might properly make a non-adjudicative fact finding of such a need (or at least determine that the Police Commissioner's non-adjudicative fact finding of such a need is supportable) as a basis for a ruling of law that, if not reversed on review by a higher court, would stand as a precedent and not merely as a fact finding applicable only to the case at hand. *Cf. Massachusetts Medical Soc'y v. Dukakis*, 637 F.Supp. 684, 689 (D.Mass. 1986), *appeal filed*, No. 86–1575 (1st Cir. June 18, 1986).

In a few reported cases, a finding of this type (non-adjudicative in nature) appears to have been made, implicitly if not explicitly, to support random drug testing. *E.g., McDonell v. Hunter*, 809 F.2d 1302 (8th Cir.1987) (need for prison security justifies drug testing of prison employees on random or uniform basis; court did not discuss record with respect to actual drug problem); *Shoemaker v. Handel*, 795 F.2d 1136 (3d Cir.) (administrative search exception to Fourth Amendment warrant requirement applied to urinalysis and breathalyzer testing of jockeys in heavily regulated horse racing industry in light of state interest in assuring public of integrity of the industry), *cert. denied*, — U.S. —, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986); *Fraternal Order of Police, Newark Lodge No. 12 v. City of Newark*, No. L–095001–85E, slip op. at 20 (N.J.Super.Ct.Law Div. March 20, 1986) (court could take "judicial notice" from "information available to everybody" that drug abuse is "pervasive throughout every aspect of the population" and conclude that "some of those affected may find their way into the Police Department"). *But see McDonell v. Hunter, supra*, 809 F.2d at 1311 (Lay, C.J., concurring in part and dissenting in part) ("Neither the environment of the prison workplace nor a well-meant desire to stem the use of illicit drugs should be used to tip the balance of Fourth Amendment interests in favor of the state without factual findings on the record to prove the institution's real needs."); *Caruso v. Ward, supra* (statistics concerning drug abuse in adolescents, department applicants, and population at large held not relevant to showing of particularized need).

It may reasonably be argued that a similar non-adjudicative fact finding of compelling need that outweighs intrusions on privacy has been implicit, if not explicit, in decisions upholding some limited forms of driver screening on the highways as a means of deterring and combatting the public menace of driving under the influence of intoxicants or drugs. *E.g., State v. Garcia*, 500 N.E.2d 158 (Ind.1986). Perhaps similar reasoning would be extended to drug testing of all operators of trains or other vehicles of public carriers involved in an accident just before the tests were administered. *Cf. Division 241, Amalgamated Transit Union (AFL–CIO) v. Suscy*, 538 F.2d 1264 (7th Cir.) (upholding testing of bus drivers after accidents), *cert. denied*, 429 U.S. 1029, 97 S.Ct. 653, 50 L.Ed.2d 632 (1976); *American Federation of Gov't Employees, AFL–CIO v. Weinberger, supra* (injunction against implementation of drug testing of government employees absent reasonable suspicion not applied to testing after accidents involving government property had occurred). This type of non-adjudicative fact finding may also have been implicit in that part of the Third Circuit's decision in *Shoemaker, supra*, that upheld the breathalyzer testing of all jockeys on a daily basis.

Where the proposed testing is to occur promptly after the subject's having been involved in an accident or race or other event during which being under the influence of drugs would have affected the integrity of the race or the likelihood of fault contributing to the accident, a test may be aimed at detecting whether one is currently under the influence of drugs (and thus likely also to have been under the influence of drugs during the relevant performance). Here, in contrast, the test is aimed at determining whether the police officer has in his or her system a residue of controlled substances, which has no appreciably stronger tendency to evidence that any performance has been affected than to evidence the ingestion of controlled substances off duty and without physical effects during performance of duty. Of course, the public has an interest in ensuring that officials (police officers as well as others) do not violate enacted laws, including those against use of controlled substances, even while off duty and without effect on performance other than through reduced public confidence in the professionalism and integrity of public employees. But the issue is whether when only this interest is involved, it alone outweighs interests protected by the Fourth and Fourteenth Amendments rather than doing so only in combination with the additional weight of interests such as those in the integrity of a specific race, the investigation of a specific accident, or a public program aimed at determining in immediate circumstances whether persons then driving on the highway are impaired.

A decision that the public interest asserted here by defendant (and by the Department of Justice amici) outweighs the Fourth and Fourteenth Amendment interests of the police personnel could only be based upon non-adjudicative fact findings concerning (a) the public interest in ensuring that police officers or other public officials do not use illicit drugs, and (b) a need for the type of drug testing prescribed by Rule 111 in order to vindicate that public interest. A non-adjudicative fact finding that this public interest outweighs the Fourth and Fourteenth Amendment rights of the police officers who would be subjected to drug testing under Rule 111 might be based on factual assertions that apply to the nation as a whole rather than to Massachusetts or the City of Boston alone. In contrast, a non-adjudicative fact finding that the asserted public interest outweighs rights protected by the Massachusetts Constitution might be a finding concerning circumstances distinctive to the Commonwealth of Massachusetts rather than circumstances common throughout the nation.

It would be inappropriate to assume, without fully considering the available evidence, that the scope of the nationwide problem of drug abuse is identical with the scope of the problem in each separate state. Also, just as evidence of the scope of the problem may vary considerably among the states, so may the other public interests of the different states that would be implicated. For example, even if evidence of drug abuse statewide in Massachusetts should lead a Massachusetts court to make a non-adjudicative fact finding in support of a legal ruling that a drug testing program such as Rule 111 is or is not valid under the Massachusetts Constitution, still a court of a different state might reach exactly the opposite non-adjudicative fact finding for that state. In contrast, a non-adjudicative fact finding made by a federal court in applying the United States Constitution might not be sensitive to the varying circumstances of the different states and might instead be based on evidence or assumptions about nationwide circumstances.

I conclude that it would be inappropriate for a federal court to address nationwide non-adjudicative fact issues incident to adjudication of the Fourth and Fourteenth Amendment claims in this case before an opportunity has been allowed for resolution of this controversy on the basis of potentially dispositive issues of state constitutional law.

## VI.

It might be argued that this court's declining to address the constitutional issues

argued by the parties, and especially those issues concerned with whether random testing is offensive to constitutional standards, is inconsistent with the actions taken by other federal courts which, under similar circumstances, have decided the constitutional issues rather than abstaining. *See, e.g., McDonell v. Hunter,* 809 F.2d 1302 (8th Cir.1987) (Iowa Department of Corrections policy of drug testing officials on uniform or systematic random basis held reasonable under Fourth Amendment); *Shoemaker v. Handel,* 795 F.2d 1136 (3d Cir.) (New Jersey statute providing for urinalysis and breathalyzer testing of jockeys valid under administrative search exception to Fourth Amendment), *cert. denied,* — U.S. —, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986); *Lovvorn v. City of Chattanooga, Tenn.,* 647 F.Supp. 875 (E.D.Tenn.1986) (mandatory drug testing of city fire fighters without reasonable suspicion and without clearly defined standards to protect individuals' expectations of privacy violated Fourth Amendment); *Penny v. Kennedy,* 648 F.Supp. 815 (E.D.Tenn.1986) (drug testing of city police officers without reasonable suspicion violated Fourth Amendment); *Capua v. City of Plainfield,* 643 F.Supp. 1507 (D.N.J.1986) (unannounced, observed collection of urine samples from city fire fighters without reasonable suspicion violated Fourth Amendment).

*McDonell, Lovvorn,* and *Penny* can all be distinguished from this case on the ground that in each of those cases, the search and seizure provision of the state constitution had been interpreted to be substantially the same as the Fourth Amendment, and therefore could not have provided a proper basis for abstention. *See State v. Lakin,* 588 S.W.2d 544 (Tenn.1979) (Article 1, section 7 of Tennessee Constitution identical in intent and purpose to Fourth Amendment and ordinarily should be construed alike); *Latham v. Sullivan,* 295 N.W.2d 472 (Iowa Ct.App.1980) (Article 1, section 8 of Iowa Constitution substantially the same as Fourth Amendment). *Shoemaker* and *Capua* cannot be distinguished on the same grounds, however, because the New Jersey Supreme Court has interpreted

the search and seizure provision of the New Jersey Constitution as providing greater protections than the Fourth Amendment. *See, e.g., State v. Novembrino,* 105 N.J. 95, 519 A.2d 820 (1987).

I nevertheless conclude that one should not read these decisions as precedents against abstention, because in none of these cases does it appear that abstention issues were raised or considered, either by the parties or by the court spontaneously.

The court in *Capua* did note that exhaustion of state remedies is not a prerequisite to bringing an action pursuant to 42 U.S.C. § 1983. *See Capua v. City of Plainfield,* 643 F.Supp. at 1512, n. 1. The *Pullman* abstention doctrine, however, is quite distinct from exhaustion requirements, and the Supreme Court has held that abstention may be appropriate in § 1983 actions. *E.g., Elkins v. Moreno,* 435 U.S. 647, 98 S.Ct. 1338, 55 L.Ed.2d 614 (1978). *See also* Field, *Abstention in Constitutional Cases: The Scope of the* Pullman *Abstention Doctrine,* 122 U.Pa.L.Rev. 1071, 1131–34 (1974).

Because none of the decisions cited immediately above addressed the issue of abstention, I conclude that they are not to be regarded as precedents overriding the well-established rule of *Pullman* and its progeny that a federal court should ordinarily decline to rule on a federal constitutional challenge to state action when the case presents unsettled questions of state law, the resolution of which may avoid or modify the federal constitutional issue.

In addition, I note that the First Circuit recently decided a federal constitutional issue in a case which involved a challenge to a state statute in circumstances that are arguably similar to those in this case. *See L.L. Bean, Inc. v. Drake Publishers, Inc.,* 811 F.2d 26 (1st Cir.1987). In *L.L. Bean,* the defendant published a prurient parody of the L.L. Bean catalogue, and L.L. Bean sued under the state trademark antidilution statute, Me.Rev.Stat.Ann. tit. 10, § 1530 (1981). The district court held that the statute applied to the parody and that its

application did not abridge the publisher's First Amendment rights, and therefore enjoined publication of the parody. *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 625 F.Supp. 1531 (D.Me.1986). On appeal, the First Circuit did not review the district court's holding on the reach of the statute, concluding instead that it would be inappropriate for the court to construe the statute in the first instance, and held that the injunction violated the First Amendment. In dissent, Chief Judge Campbell argued that before reaching the question of the statute's constitutionality, the court should have allowed the state court to decide whether a parody of that nature would violate the statute. *L.L. Bean, Inc. v. Drake Publishers, Inc., supra*, at 34 (Campbell, C.J., dissenting).

In *L.L. Bean*, the district court reached the constitutional issue only after determining that the state law issue was clear, and therefore did not face an issue of state law that it considered to be unclear. The majority declined to review this ruling on appeal. Although the court might have concluded that the state law issue was unclear had it chosen to review the district court's ruling (as Chief Judge Campbell apparently did), the majority chose to let that part of the district court's ruling stand and proceeded to decide the constitutional issue. In the present case, in contrast, I have concluded that the state law issue is unsettled and unclear. I therefore conclude that the First Circuit's decision in *L.L. Bean* should not be interpreted as a precedent against abstention in the circumstances of the present case.

## VII.

Having concluded that abstention is appropriate in this case, I must now consider what procedures should be followed in order to ensure that the plaintiff has an opportunity to obtain a definitive ruling on his state law claims in a state court without sacrificing his ability to have his federal constitutional claim heard by this court if he is unable to receive redress through those state law claims. In *Pullman*, the

Supreme Court ordered abstention only in the absence of any showing that a definitive state court ruling could not be obtained with full protection of the federal constitutional claim. *Texas Railroad Comm'n v. Pullman Co., supra*, 312 U.S. at 501, 61 S.Ct. at 645. The Court remanded the case to the district court "with directions to retain the bill pending a determination of proceedings, to be brought with reasonable promptness in the state court." *Id.* at 501–02, 61 S.Ct. at 645–46.

In *England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964), the Supreme Court explained the procedures to be followed by a federal litigant who initiates proceedings in state court as a result of an abstention order but seeks to preserve his federal constitutional claims for consideration by the federal court should he fail to obtain relief on his state law claims. Pursuant to the *England* doctrine, this type of litigant should bring both his state and federal claims before the state court so that the state statute can be construed in light of the federal claims, *see Government & Civic Employees Organizing Comm., CIO v. Windsor*, 353 U.S. 364, 77 S.Ct. 838, 1 L.Ed.2d 894 (1957), but should inform the state courts and give notice that he does not seek to have the federal claims decided there and instead intends to return to the federal court for decision on the federal claims, if necessary. *England v. Louisiana State Bd. of Medical Examiners*, 375 U.S. at 421, 84 S.Ct. at 467.

Another means for having the state law issues presented to state courts is to have the federal court certify a specific question or questions to the highest state court. This approach has been favored by commentators because, where available, it generally provides a far swifter means to secure a definitive ruling on the state law issues than can be achieved by the litigants initiating proceedings in a lower state court and seeking further review if necessary. *See, e.g.,* Field, *The Abstention Doctrine Today*, 125 U.Pa.L.Rev. 590, 605–09 (1977). *Cf. L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26, 34–35 (1st Cir.1987)

(Campbell, C.J., dissenting) (arguing that court should not have decided constitutionality of state statute without first certifying issue of state law to Maine Supreme Judicial Court).

■ Although the Massachusetts Supreme Judicial Court has authorized certification of questions from federal courts, *see* S.J.C. Rule 1:03 (1986), I conclude that certification would not be appropriate in this case. The Supreme Judicial Court requires a certification order to set forth:

(1) the question of law to be answered; and

(2) a statement of all facts relevant to the questions certified and showing fully the nature of the controversy in which the questions arose.

S.J.C. Rule 1:03, § 3 (1986).

On the present record, in which the parties have chosen to focus only on federal constitutional issues and not upon state law issues (either under the state constitution or under other state law), this court could not fashion a certification order that would meet these requirements. It may be argued that no trial record is essential insofar as the issues would depend upon non-adjudicative fact finding. Nevertheless, the possibility remains that the Supreme Judicial Court would decline to decide the state constitutional law issue before examining other potentially dispositive state law issues, including issues under the state civil service laws suggested by Part III of this Memorandum, *supra*. The record in this case is inadequate even to identify all such issues, and the more clearly inadequate to frame the questions of state law to be answered.

I therefore conclude that certification of questions of state law to the Supreme Judicial Court would not be efficacious, and that procedures such as those explained in *England v. Louisiana State Board of Medical Examiners, supra,* are sufficient to protect the plaintiff's interests in this case. I reach this conclusion having considered the concerns raised by commentators about the delays inherent in the *England* procedures. *See, e.g.,* Field, *The Ab-stention Doctrine Today,* 125 U.Pa.L.Rev. 590, 605–09 (1977). I conclude, however, that concerns about the delays imposed by abstention do not in this case outweigh the well-established judicial policy of abstaining to avoid unnecessary constitutional decisions when the case presents unsettled questions of state law which are potentially dispositive. The delay in this case is not incident to abstention itself, but stems from the need to avoid the impropriety of deciding constitutional questions on the basis of unsupported assumptions about state law. Furthermore, I note that the Massachusetts courts offer plaintiff an opportunity to seek an expedited hearing on his state law claims should he reassert his prayer for injunctive relief in a state court action. Thus, the delay which plaintiff may encounter in securing a decision on his federal constitutional claims can be minimized by state court procedures available to expedite disposition of equitable claims.

## VIII.

■ As a final matter, I consider whether plaintiff's request for preliminary injunctive relief should be granted pending resolution of the state law issues. Although the parties have proceeded to trial in this case without a preliminary injunction hearing, plaintiff did so at the court's request to expedite the case, and I therefore conclude that the request for such relief is ripe for decision at this time.

Two of the criteria that must be satisfied in order to demonstrate entitlement to a preliminary injunction are a showing of a likelihood of success on the merits and a showing that plaintiff will suffer irreparable harm without the injunction. *Planned Parenthood League of Massachusetts v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981). As to the likelihood of success on the merits, I conclude that the court could not make a determination favorable to the plaintiff without deciding issues as to which I have concluded abstention is appropriate. As to irreparable harm, the parties have stipulated that Rule 111 will not be enforced pending the ruling by this court,

*see* Stipulated Agreement of Facts Between the Parties at para. 3 (as amended Dec. 15, 1986). Since this court has abstained rather than ruling on the merits, this stipulation remains in force and plaintiff therefore cannot show that he will suffer irreparable injury without the preliminary injunction. I therefore conclude that plaintiff's prayer for a preliminary injunction should be denied.

I note that the denial of the preliminary injunction is a decision which creates grounds for an appeal under 28 U.S.C. § 1292(a)(1) (1984). It thus avoids an additional problem with the abstention doctrine—doubt about whether abstention orders are reviewable. *See* Field, *The Abstention Doctrine Today*, 125 U.Pa.L.Rev. 590, 592–601 (1977).

### IX.

With respect to a precise form of order that effectuates the objectives of abstention while holding the doors of this court open to adjudication of plaintiff's federal constitutional claims if plaintiff does not obtain relief on his state claims after duly advancing them in state courts, I conclude that this action should be dismissed, but upon the following two conditions: first, the dismissal will be without prejudice on the merits; second, this court will retain jurisdiction to reopen the case upon motion supported by a showing that, after reasonable efforts to obtain relief (either preliminarily or permanently) under state law, plaintiff cannot obtain relief without resort to the federal constitutional claims asserted here. *See Harris County Comm'rs Court v. Moore*, 420 U.S. 77, 88–89, 95 S.Ct. 870, 877–878, 43 L.Ed.2d 32 (1975).